Breitel, J.
Plaintiff 407 East 61st Garage, Inc., appeals from an order of the Appellate Division unanimously affirming, without opinion, an order of the Supreme Court, New York County. The Supreme Court, in an opinion, denied plaintiff’s motion for an order striking defendant’s answer, granting summary judgment, and directing an assessment of damages, and instead granted the cross motion of defendant Savoy Fifth Avenue Corporation for summary judgment.
Plaintiff garage .seeks damages for defendant Savoy’s alleged breach, by termination, of a contract between the parties, resulting from Savoy’s discontinuance of its operation of the Savoy Hilton Hotel. Under a written agreement the garage had undertaken to furnish garage services for a period of five years to guests of the Savoy Hilton and to pay Savoy 10% of its gross transient storage charges to the hotel guests. Savoy agreed to use all reasonable efforts to provide the garage with exclusive opportunity for storage of the motor vehicles of the hotel guests.
The issue is whether the closing of the hotel prior to the expiration of the contract period, due to the asserted financial inability of Savoy to remain in the hotel business, subjects it to continued liability under the contract. The Supreme Court, characterizing the agreement as a requirements contract, held that, absent an express contract provision requiring Savoy to remain in the hotel business, and absent allegations of bad faith, Savoy is not liable for anticipatory breach of contract.
It is concluded that, by ceasing operation of its hotel, Savoy is not excused, as a matter of law, from obligations under its agreement with the garage, and that there is, at least, an issue of fact as to implied conditions in the agreement.
Pursuant to the written agreement, dated October 1, 1963, plaintiff garage undertook to furnish adequate garage services and facilities to any guests of the Savoy Hilton Hotel who requested them. The garage was fully responsible for the billing and collection of charges for its services. Any damage to an automobile between its delivery to a representative of the garage and its return was the responsibility of the garage. The garage also agreed to have adequate supplies on hand, to obtain all necessary insurance and permits, to conform to applicable regulations of the Savoy, and to have its employees act in such a manner as to “ promote the best interests ” of Savoy. Savoy *278 on its part agreed ‘ ‘ to use all reasonable efforts to enable [the garage] to have, throughout the term of this agreement, the exclusive right and privilege of storing the motor vehicles of [the hotel’s] guests, tenants and patrons Savoy was not responsible, however, for any charges incurred by its guests for services rendered by the garage. The garage was allowed to maintain, at its own expense, a direct telephone line between the hotel and the garage. In exchange, the garage agreed to pay to Savoy 10% of the transient storage charges incurred by hotel guests. The term of the agreement was from October 1, 1963 to September 30, 1968.
In late June, 1965, due to substantial financial losses, Savoy ceased operating the hotel. The hotel building was demolished and an office building erected on its site. The garage asserts that a one-half- interest in the property was sold to General Motors Corporation, and that the office building is owned jointly by General Motors and Savoy. Savoy apparently claims that it sold 50% of its capital stock to General Motors.
The agreement does not explicitly obligate Savoy to remain in the hotel business during the contract term or, put another way, to fulfill its obligations for the term even if it should wish to cease operation of a hotel. On the other hand, the only provision concerning termination allows Savoy to terminate the contract should the garage default in the performance of any condition, including the provision of adequate service, and then fail to cure the default within 30 days after receiving written notice. It was provided further that all duties of each of the parties were to be performed ‘ ‘ during the term ’ ’ of the contract.
The Supreme Court, in granting defendant Savoy’s cross motion for summary judgment, relied on Du Boff v. Matam Corp. (272 App. Div. 502), which held that a party to a “ requirements ’ ’ contract may cease doing business in good faith without incurring liability for breach of contract. However, the agreement between the garage and Savoy is not a ■“ requirements ” contract, but is akin to the grant of a license or franchise by Savoy to the garage. Thus, services were to be rendered by the garage not to Savoy but to third parties, that is, the guests of the hotel. Savoy did not undertake to compensate the garage, but was instead to be compensated by the garage for the exclusive opportunities granted. The garage benefited by gaining *279 a preferred position in obtaining the hotel guests as customers for its services. The hotel benefited by receiving a guarantee that its guests would be able to obtain adequate garage services when and if they desired them, thus making their stay at the hotel more convenient and desirable.
Categorization of the agreement, whether as a “ requirements ” contract, a “ license ” or a “ franchise ”, in order to determine the obligations of the parties, is only partially helpful. Under the ‘ ‘ requirements ’ ’ contract analysis used by the Supreme Court, it would seem that, absent an allegation of bad faith, there was no cause of action stated for breach of contract (see, e.g., Du Boff v. Matam Corp., supra; but see, contra, Wells v. Alexandre, 130 N. Y. 642, 645-646). Analogically, in the context of agreements for the use of space, if the contract is considered a license or concession, the general rule is that revocation of a license granted for a stipulated term may be a breach of contract and may result in the imposition of liability for damages (Dickinson v. Mart, 142 N. Y. 183, 187; 17 N. Y. Jur., Easements and Licenses, §§ 213, 217, 221; cf. Melodies, Inc. v. Mirabile, 7 A D 2d 783, modfg. 4 Misc 2d 1062; Schusterman v. C & F Caterers, 192 Misc. 564, 567). Thus, if the garage had been granted a license to operate its enterprise on Savoy’s premises, liability might persist after sale of the building.
Additionally, if the contract is construed as one granting an exclusive agency for the rendition of services, then again, Savoy, by ceasing operation of the business to which the services were incident, may be liable for breach of contract (Wilson Sullivan Co. v. International Paper Makers Realty Corp., 307 N. Y. 20, 25; Hudak v. Hornell Ind., 304 N. Y. 207, 213-214; but see Wolf Studebaker v. Studebaker-Packard Corp., 50 Misc 2d 226, 229-230, affd. 26 A D 2d 992 [involving an automobile sales agency for an indefinite period and the relocation of the manufacturing plant]).
In ultimate analysis, however, an attempt to categorize or ‘1 pigeonhole ’ ’ the contract is a circuitous way of answering what is basically a simple question of contract interpretation or construction. The real issue in this case is not what kind of contractual relationship is involved, but whether this agreement imports an implication that Savoy was obligated to remain in *280 the hotel business, or, better, had undertaken indefeasible obligations for the full term.
Under familiar rules a promise that a party will continue to remain in business may be implied in fact as part of an agreement for the rendition of services to a business (Wigand v. Bachmann-Bechtel Brewing Co., 222 N. Y. 272, 277-280; Horton v. Hall & Clark Mfg. Co., 94 App. Div. 404, 407; see Restatement, Contracts, § 314, esp. Illustrations 5 and 6; see, also, involving substantial changes of method in business operations, West, Weir & Bartel v. Mary Carter Paint Co., 25 A D 2d 81, 86, app. dsmd. 19 N Y 2d 812; Carlton Illustrators v. American Locomotive Co., 168 App. Div. 289, 292).
Such a promise to remain in business will be implied particularly where the promisee has undertaken certain burdens or obligations in expectation of and reliance upon the promisor’s continued activity (Wigand v. Bachmann-Bechtel Brewing Co., supra). Here, the garage may have undertaken certain additional continuing responsibilities, such as the obtaining of adequate insurance and perhaps even the signing of employment contracts and agreements for the purchase of supplies for the lifetime of the contract.
Savoy, based on inferences, contends that the garage was aware, prior to the signing of the agreement, that the hotel was in financial difficulty, and should be charged with acceptance of the likelihood that the hotel would close. Savoy, of course, was at least equally or better aware of this situation. The obvious solution would have been an express provision that the agreement would terminate upon specified notice to the garage or would terminate if the hotel should close. Yet, the only right of termination by Savoy expressed in the agreement was based upon default in performance by the garage. Certainly the inference by Savoy that the garage knew of the hotel’s financial difficulties does not give rise, as a matter of law, to the conclusion that the contract implies a conditional termination, should the hotel cease operation. It could be just as easily concluded that such a provision was intentionally omitted and that otherwise the garage would not have entered into the agreement.
There is another inchoate issue raised by Savoy’s argument. It emphasizes, as it well might, the incongruity of an enterprise, as large as a metropolitan hotel, being obligated to “ continue *281 in the hotel business ” merely because of various relatively minor incidental service contracts, such as that involved here. The mere incongruity would not lessen Savoy’s liability, but it does suggest that there may be a custom or usage in this industry to regard incidental service contracts for a period terminable on the hotel’s going out of business. If there be such custom and usage, there is nothing in the record to show it. Upon a trial, of course, the hotel would be ajble to show such a custom and usage, or any other circumstances which would, subject to the parol evidence rule, establish the correct interpretation or understanding of the agreement as to its term. Certainly, the mere statement of a term in this kind of incidental service agreement is not so free from ambiguity to preclude extrinsic evidence.
At the very least, therefore, an issue of fact is presented whether the agreement did import an implied promise by Savoy to fulfill its obligations for an entire five-year period.
Assuming such an implication, Savoy might, nevertheless, assert the hotel’s financial situation as a legal excuse for its failure to continue operation of the hotel. It does point out that it was economically impossible (or rather extremely burdensome) for it to remain in the hotel business. Thus, it may be argued that the basic purpose of the contract, to insure that guests of the hotel would receive adequate garage services, was rendered impossible of performance, or, perhaps, was frustrated, when the hotel was no longer in a financial position to cater to guests. Phrased in these terms, the issue is sometimes regarded as a matter of excuse from performance, apart from the contract, rather than being treated as an implied condition for performance derived from the contractual arrangements between the parties.
Generally, however, the excuse of impossibility of performance is limited to the destruction of the means of performance by an act of God, vis major, or by law (International Paper Co. v. Rockefeller, 161 App. Div. 180,184; 6 Williston, Contracts [Rev. ed.], § 1935; 10 N. Y. Jur., Contracts, § 357; Restatement, Contracts, § 457). Thus, where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused (Central Trust Co. v. Chicago Auditorium, 240 U. S. 581; Cameron-Hawn Realty Co. *282 v. City of Albany, 207 N. Y. 377, 380-381; Updike v. Oakland Motor Car Co., 229 App. Div. 632, 635; Downey v. Shipston, 206 App. Div. 55, 58; International Paper Co. v. Rockefeller, 161 App. Div. 180,185, supra; Stannard v. Reid & Co., 114 App. Div. 135, 136; 6 Willis ton, Contracts [Rev. ed.], § 1963; see, generally, 10 N. Y. Jur., Contracts, §§ 356, 357, 359, 372; Ann.: Contract-Performance-Impossibility, 84 A L R 2d 12, esp. pp. 21-24, 28-29 and 52-55; Restatement, Contracts, §§ 454, 455, 457, 467). Notably, in this case, Savoy does not even assert that bankruptcy or insolvency was a likely consequence of continuing operation of the hotel. Further, in view of its admittedly contemporaneous financial difficulties, Savoy could and should have insisted that the agreement provide for the anticipated contingency of economic hardship (cf. Restatement, Contracts, § 457). In sum, performance by Savoy was at all times possible, although unprofitable, since the hotel could simply have remained in business, and the legal excuse of impossibility of performance would not be available to it.
Cases involving frustration of the purpose of the contract are inapposite. Here, the purpose of providing garage services to hotel guests was frustrated only when Savoy itself made a business decision to close the hotel, and did not result from unanticipated circumstances (see Frenchman & Sweet v. Philco Discount Corp., 21 A D 2d 180, 182; cf. Ewing Co. v. New York State Teachers’ Retirement System, 14 A D 2d 113, 115, affd. 11 N Y 2d 749; Marks Realty Co. v. Hotel Hermitage Co., 170 App. Div. 484; 6 Williston, Contracts [Rev. ed.], §§ 1951, 1959; Restatement, Contracts, § 288). Moreover, rather than relying on a circumstance that was unanticipated, Savoy itself argues that its financial stringency was always known.
In short, the applicable rules do not permit a party to abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts. If, in fact, the agreement expresses or implies a promise that the hotel would remain liable for the contract term, that promise should be honored, regardless of financial hardship.
Concededly, it would not have made sense for Savoy to stay in the hotel business solely to avoid liability for breach of its *283 contrae]: with the garage. Such lack of business reason does not nullify the liability for damages, whatever effect it may have on a right to specific performance. However, if the patronage at the hotel had declined, proof of that situation, although perhaps not justifying termination of the garage’s contract right, may have a significant bearing on the measure of damages sustained by the garage through loss of future profits (see, e.g., West, Weir & Bartel v. Mary Carter Paint Co., 25 A D 2d 81, esp. 87-89, supra; see, also, Dickinson v. Hart, 142 N. Y. 183, 187-188, supra).
Accordingly, the order should be modified, with costs, by denying defendant’s cross motion for summary judgment and, as so modified, affirmed.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Keating and Jasen concur.
Order modified, with costs, by remitting the case to Special Term for further proceedings in accordance with the opinion herein and, as so modified, affirmed.