**TELECOMMUNICATIONS CORPORA-TION of America, Plaintiff,**

v.

**FRANCHISES INTERNATIONAL, INC., Defendant.**

**No. 71 Civ. 1914.**

United States District Court, S. D. New York.

June 30, 1971.

Rabin & Silverman, New York City, for plaintiff; I. Stephen Rabin, New York City, of counsel.

Greenspan, Aurnou & Davis, White Plains, for defendant; Stephen Davis, White Plains, of counsel.

Memorandum Opinion

LASKER, District Judge.

Plaintiff moves for a preliminary injunction restraining defendant from selling or otherwise transferring shares of stock of Robotguard, Inc. which have heretofore been issued to defendant and shares of Telecommunications Corporation of America which are about to be distributed as a dividend on the Robotguard stock.

## I.

Plaintiff is the successor of Robotguard, Inc., a Delaware corporation, which heretofore transferred to plaintiff all of its assets, including its rights under the contract upon which the suit is brought. That contract was entered into between Robotguard, Inc. and the defendant ("FI") in 1968. By its terms Robotguard hired FI (1) to develop a franchise marketing program for Robotguard's product, and (2) to act as Robotguard's exclusive agent for the sale of franchises for a period of three years (later extended to four).[1]

As compensation, defendant was to receive (1) $25,000 in installments during the period of 90 days from the contract date, and (2) 115,840 shares of Robotguard stock "on the date that FI shall have completed and delivered to Client the material relevant to the Franchise Marketing Program required" under paragraph B of the contract (six months). The payment of these items was timely made by Robotguard.

FI commenced fulfillment of its obligations under the contract, but its efforts had resulted in the sale of only eight franchises (from which Robotguard received only $10,000) when, on April 10, 1970, without prior warning, FI wrote to Robotguard, Inc. as follows: "It is with deep regret that I must inform you that the Board of Directors of Franchises International, Inc., at a meeting held this date, has decided to suspend active business operations of Franchises International, Inc."

Plaintiff asserts (affidavit of David Lipschutz, president of Telecommunications, sworn to April 28, 1971, at p. 6), and it is not seriously disputed by defendant, that defendant's suspension of operations was caused by its critical financial condition. Reports in the public press on a date earlier than FI's suspension of operations support this contention. For example, the New York Times, in its column entitled "Market Place," reported on December 19, 1969 that FI was "apparently being hobbled by the parent company in its long-range plans through a lack of financial support," referring to a statement by the resigning executive vice president of FI that FI's parent, City Investing Company, had advanced money to FI "by fits and starts" and that FI had been losing " 'considerable' money in the last six months," estimating the sum at more than $500,000.

Claiming that FI had repudiated the contract after only nine months of a four-year term, and had failed to fulfill its contract obligation to use its "best efforts to establish [Robotguard's] franchise network as rapidly and efficiently as possible," Robotguard demanded that FI return to it the 115,840 shares of Robotguard stock. FI refused, and Robotguard instituted this action.

The complaint contains two counts. The first alleges that by ceasing to do business FI breached and repudiated the agreement to use its best efforts to sell Robotguard franchises and to act as Robotguard's exclusive sales agency. The second alleges fraud and misrepresentation, asserting that FI had represented,

---

1. The relevant contract language reads: "Client hereby engages the services of FI to develop a franchise marketing program based upon those of Client's corporate needs and objectives communicated to FI; thereafter, to sell this program to establish for Client a network of franchisees; and FI agrees to undertake the foregoing, upon the following terms and conditions:

\* \* \* \* \*

"B.
 11. [FI will] use its best efforts to establish Client's franchise network as rapidly and efficiently as possible. For this purpose, FI shall utilize the services of the FI Franchise Sales Center System and/or its own Marketing Department. FI shall have the right, in its sole discretion, to sell Client's franchise program through its own corporate organization or through that of any of its wholly owned subsidiaries.

\* \* \* \* \*

"C.
 4. The agency of FI to sell franchises hereunder shall remain in full force and effect for a period of four (4) years, this term to commence July 1, 1969."

prior to the execution of the agreement, that its parent, City Investing Company, had agreed to make available to FI the capital necessary for FI to fulfill its obligations under the agreement; that these representations were known by FI to be untrue, were made for the purpose of inducing Robotguard to enter into the agreement, and that Robotguard relied on them.

The ultimate relief sought is the rescission of the agreement and an order to plaintiff to return the consideration of $25,000 and the Robotguard stock heretofore paid by Robotguard to FI. It is FI's position that as a matter of New York law, which governs, the plaintiff is not entitled to rescission. FI argues that the contract is divisible into two parts, the first relating to the creation of the franchise program and the second to the sales agency; that the compensation of $25,000 and Robotguard stock was intended by the parties to apply only to the creation of the franchise program (with other compensation to be made for selling activities); that since the creation of the franchise program has been completed, the defendant has performed its obligation as to that part of the contract and is entitled to retain its compensation. Incidently, defendant notes that in the course of its performance of the contract it has spent about $228,000.

## II.

The criteria for the granting of a preliminary injunction are classically described as a showing of the probability of success and the possibility of irreparable injury. As more fully stated in a recent opinion by the Court of Appeals for this Circuit in Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323, cert. den. 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969):

"The purpose of a preliminary injunction is to maintain the status quo pending a final determination of the merits (citations omitted). It is an extraordinary remedy, and will not be granted except upon a clear showing of probable success *and* possible irreparable injury (citations omitted). However, 'the burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief.' (citation omitted). In such a case, the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation." (Emphasis in original.)

See also: Clairol, Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968); Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840 (2d Cir. 1967); Studebaker Corp. v. Gittlin, 360 F.2d 692 (2d Cir. 1966); Societe Comptoir De L'Indus., etc. v. Alexander's Department Stores, Inc., 299 F.2d 33, 35 (2d Cir. 1962).

Measured by these standards, it is proper that the defendant here should be enjoined pendente lite.

### A. Probable Success

Relying on such cases as 407 E. 61st Garage v. Savoy Fifth Ave. Corp., 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37 (1968), plaintiff has made a strong showing on the merits. In that case plaintiff had contracted with the defendant to operate a garage in defendant's hotel. Due to substantial financial losses, defendant ceased operating the hotel during the term of the agreement. In reversing the lower court's grant of defendant's motion for summary judgment, the New York Court of Appeals held that, although the contract did not explicitly obligate Savoy to remain in business during the contract term, Savoy was nevertheless "not excused, as a

matter of law, from obligations under its agreement with the garage," and concluded "that there is, at least, an issue of fact as to implied conditions in the agreement." As the Court of Appeals put it (23 N.Y.2d at 279–280, 296 N.Y.S.2d at 342, 244 N.E.2d at 40):

"The real issue in this case is not what kind of contractual relationship is involved [that is, an exclusive agency, contract for the use of space, etc.], but whether this agreement imports an implication that Savoy was obligated to remain in the hotel business, or, better, had undertaken indefeasible obligations for the full term."

Reviewing New York law on the subject, the Court stated:

"Under familiar rules a promise that a party will continue to remain in business may be implied in fact as part of an agreement for the rendition of services to a business (citations omitted).

"Such a promise to remain in business will be implied particularly where the promisee has undertaken certain burdens or obligations in expectation of and reliance upon the promisor's continued activity."

The Court further observed (at 281–283, 296 N.Y.S.2d at 344, 244 N.E.2d at 41):

"Thus, where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused. * * * In sum, performance by Savoy was at all times possible, although unprofitable, since the hotel could simply have remained in business, and the legal excuse of impossibility of performance would not be available to it.

*     *     *     *     *     *

"In short, the applicable rules do not permit a party to abrogate a contract, unilaterally, merely upon a showing

that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts. If, in fact, the agreement expresses or implies a promise that the hotel would remain liable for the contract term, that promise should be honored, regardless of financial hardship."

■■ Here, the agreement certainly implied that FI would remain in business during the term of the contract. The contract is for a specific term, it calls for the use of FI's "best efforts" to fulfill its obligations, and, notably, it states minimal standards which, if not met by FI, give Robotguard (not FI) the unilateral right to cancel. It is true that the contract does not explicitly obligate FI to remain in business, but that was equally so in the *Savoy* case. Furthermore, here, as in *Savoy*, the promisee, Robotguard, has undertaken certain burdens or obligations in expectation of and in reliance upon promisor's continuing activity—that is, Robotguard has paid cash and stock to FI—and, as indicated above, under such circumstances a promise to remain in business is "particularly" implied under New York law.

Even if this is so, however, defendant argues that the contract is divisible and that it is entitled to keep the payment it has received, which was intended to be solely in compensation for the creation of the franchise program which, it asserts, has already been completed. But the detailed and lengthy contract, upon a careful reading, nowhere spells out a divisibility of its obligations. It is true that the agreement provides for the delivery of the Robotguard stock to FI "on the date that FI shall have completed and delivered to Client the material relevant to the Franchise Marketing Program required" under the contract, but read in context this wording does not establish that the payment of stock was specified as compensation for creation of the program only, but merely sets a time for its delivery. Whether extrinsic evi-

dence on this point will be admissible at trial, and, if so, whether it will support defendant's position, must be left to the future; but on the record as it stands, defendant's claim that the contract is divisible must fall.

### B. Irreparability of Damage

Whether the injunction is granted or not, one of the parties may suffer damage. If the defendant is enjoined, its right to transfer or sell the stock will, of course, be inhibited. If the defendant is not enjoined, the specific res of which plaintiff seeks possession—that is, the Robotguard stock—may be unavailable even if plaintiff prevails on the merits. Balancing the hardships, it seems clear that the risk of irreparable damage is greater to the plaintiff than to the defendant. As the Court of Appeals of this Circuit stated in Checker Motors Corp. v. Chrysler Corp., supra, 405 F.2d at 323, " 'where the balance of hardships tips decidedly toward the party requesting the temporary relief' * * * the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation." Certainly the plaintiff here has met this test. The questions it raises are serious and substantial, and the risk which it faces is made more real by virtue of the defendant's apparent financial instability.

For the reasons stated above the motion for a preliminary injunction is granted. However, defendant is entitled to a prompt determination of the merits of the case, and the order to be submitted hereunder shall provide for early completion of discovery, if any is necessary, and a prompt trial.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Settle order on notice.