**James BLOOR, as Reorganization Trustee of Balco Properties Corporation, Plaintiff-Appellee and Cross-Appellant,**

**v.**

**FALSTAFF BREWING CORPORATION, Defendant-Appellant and Cross-Appellee.**

Nos. 555, 558, Dockets 78–7451, 78–7465.

United States Court of Appeals, Second Circuit.

Argued March 28, 1979.

Decided May 15, 1979.

---

**610**

Robert G. Sugarman, New York City (Weil, Gotshal & Manges, New York City, Joseph H. Weiss, and R. Peyton Gibson, New York City, of counsel), for plaintiff-appellee and cross-appellant.

Lewis A. Kaplan, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Andrew Kull, New York City, of counsel), for defendant-appellant and cross-appellee.

Before MOORE, FRIENDLY and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

This action, wherein federal jurisdiction is predicated on diversity of citizenship, 28 U.S.C. § 1332, was brought in the District Court for the Southern District of New York, by James Bloor, Reorganization Trustee of Balco Properties Corporation, formerly named P. Ballantine & Sons (Ballantine), a venerable and once successful brewery based in Newark, N. J. He sought to recover from Falstaff Brewing Corporation (Falstaff) for breach of a contract dated March 31, 1972, wherein Falstaff bought the Ballantine brewing labels, trademarks, accounts receivable, distribution systems and other property except the brewery. The price was $4,000,000 plus a royalty of fifty cents on each barrel of the Ballantine brands sold between April 1, 1972 and March 31, 1978. Although other issues were tried, the appeals concern only two provisions of the contract. These are:

8. *Certain Other Covenants of Buyer.* (a) After the Closing Date the [Buyer] will use its best efforts to promote and maintain a high volume of sales under the Proprietary Rights.

2(a)(v) [The Buyer will pay a royalty of $.50 per barrel for a period of 6 years], provided, however, that if during the Royalty Period the Buyer substantially discontinues the distribution of beer under the brand name "Ballantine" (except as the result of a restraining order in effect for 30 days issued by a court of competent jurisdiction at the request of a governmental authority), it will pay to the Seller a cash sum equal to the years and fraction thereof remaining in the Royalty Period times $1,100,000, payable in equal monthly installments on the first day of each month commencing with the first month following the month in which such discontinuation occurs . . . .

Bloor claimed that Falstaff had breached the best efforts clause, 8(a), and indeed that its default amounted to the substantial discontinuance that would trigger the liquidated damage clause, 2(a)(v). In an opinion that interestingly traces the history of beer

back to Domesday Book and beyond, Judge Brieant upheld the first claim and awarded damages but dismissed the second. Falstaff appeals from the former ruling, Bloor from the latter. Both sides also dispute the court's measurement of damages for breach of the best efforts clause.

We shall assume familiarity with Judge Brieant's excellent opinion, 454 F.Supp. 258 (S.D.N.Y.1978), from which we have drawn heavily, and will state only the essentials. Ballantine had been a family owned business, producing low-priced beers primarily for the northeast market, particularly New York, New Jersey, Connecticut and Pennsylvania. Its sales began to decline in 1961, and it lost money from 1965 on. On June 1, 1969, Investors Funding Corporation (IFC), a real estate conglomerate with no experience in brewing, acquired substantially all the stock of Ballantine for $16,290,000. IFC increased advertising expenditures, levelling off in 1971 at $1 million a year. This and other promotional practices, some of dubious legality, led to steady growth in Ballantine's sales despite the increased activities in the northeast of the "nationals" [1] which have greatly augmented their market shares at the expense of smaller brewers. However, this was a profitless prosperity; there was no month in which Ballantine had earnings and the total loss was $15,500,000 for the 33 months of IFC ownership.

After its acquisition of Ballantine, Falstaff continued the $1 million a year advertising program, IFC's pricing policies, and also its policy of serving smaller accounts not solely through sales to independent distributors, the usual practice in the industry, but by use of its own warehouses and trucks—the only change being a shift of the retail distribution system from Newark to North Bergen, N.J., when brewing was concentrated at Falstaff's Rhode Island brewery. However, sales declined and Falstaff claims to have lost $22 million in its Ballantine brand operations from March 31, 1972 to June 1975. Its other activities were also performing indifferently, although with no such losses as were being incurred in the sale of Ballantine products, and it was facing inability to meet payrolls and other debts. In March and April 1975 control of Falstaff passed to Paul Kalmanovitz, a businessman with 40 years experience in the brewing industry. After having first advanced $3 million to enable Falstaff to meet its payrolls and other pressing debts, he later supplied an additional $10 million and made loan guarantees, in return for which he received convertible preferred shares in an amount that endowed him with 35% of the voting power and became the beneficiary of a voting trust that gave him control of the board of directors.

Mr. Kalmanovitz determined to concentrate on making beer and cutting sales costs. He decreased advertising, with the result that the Ballantine advertising budget shrank from $1 million to $115,000 a year.[2] In late 1975 he closed four of Falstaff's six retail distribution centers, including the North Bergen, N.J. depot, which was ultimately replaced by two distributors servicing substantially fewer accounts. He also discontinued various illegal practices that had been used in selling Ballantine products.[3] What happened in terms of sales volume is shown in plaintiff's exhibit 114 J, a chart which we reproduce in the

1. Miller's, Schlitz, Anheuser-Busch, Coors and Pabst.

2. This was for cooperative advertising with purchasers.

3. There were two kinds of illegal practices, the testimony on both of which is, unsurprisingly, rather vague. Certain "national accounts", i. e. large draught beer buyers, were gotten or retained by "black bagging", the trade term for commercial bribery. On a smaller scale, sales to taverns were facilitated by the salesman's offering a free round for the house of Ballantine if it was available ("retention"), or the customer's choice ("solicitation"). Both practices seem to have been indulged in by many brewers, including Falstaff before Kalmanovitz took control.

margin.[4] With 1974 as a base, Ballantine declined 29.72% in 1975 and 45.81% in 1976 as compared with a 1975 gain of 2.24% and a 1976 loss of 13.08% for all brewers excluding the top 15. Other comparisons are similarly devastating, at least for 1976.[5] Despite the decline in the sale of its own labels as well as Ballantine's, Falstaff, however, made a substantial financial recovery. In 1976 it had net income of $8.7 million and its year-end working capital had increased from $8.6 million to $20.2 million and its cash and certificates of deposit from $2.2 million to $12.1 million.

Seizing upon remarks made by the judge during the trial that Falstaff's financial standing in 1975 and thereafter "is probably not relevant" and a footnote in the opinion, 454 F.Supp. at 267 n. 7,[6] appellate counsel for Falstaff contend that the judge read the best efforts clause as requiring Falstaff to maintain Ballantine's volume by any sales methods having a good prospect of increasing or maintaining sales or, at least, to continue lawful methods in use at the time of purchase, no matter what losses they would cause. Starting from this premise, counsel reason that the judge's conclusion was at odds with New York law, stipulated by the contract to be controlling, as last expressed by the Court of Appeals in *Feld v. Henry S. Levy & Sons, Inc.,* 37

N.Y.2d 466, 373 N.Y.S.2d 102, 335 N.E.2d 320 (1975). The court was there dealing with a contract whereby defendant agreed to sell and plaintiff to purchase all bread crumbs produced by defendant at a certain factory. During the term of the agreement defendant ceased producing bread crumbs because production with existing facilities was "very uneconomical", and the plaintiff sued for breach. The case was governed by § 2–306 of the Uniform Commercial Code which provides:

§ 2–306. Output, Requirements and Exclusive Dealings

(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

(2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

---

4.

Percentage Increase or Decline in Sales Volume of Ballantine Beer, Falstaff Beer and Comparable Brewers for Years Ending December 31, 1972-1976

1 Ballantine Beer
2 Falstaff Beer
3 All brewers except top 10
4 All brewers except top 15
5 All brewers except top 20
6 Eastern Brewers
7 Comparably sized brewers, adjusted

5. Falstaff argues that a trend line projecting the declining volume of Ballantine's sales since 1966, before IFC's purchase, would show an even worse picture. We agree with plaintiff that the percentage figures since 1974 are more significant; at least the judge was entitled to think so.

6. "Even if Falstaff's financial position had been worse in mid-1975 than it actually was, and even if Falstaff had continued in that state of impecuniosity during the term of the contract, performance of the contract is not excused where the difficulty of performance arises from financial difficulty or economic hardship. As the New York Court of Appeals stated in *407 E. 61st St. Garage, Inc. v. Savoy Corp.,* 23 N.Y.2d 275, 281, 296 N.Y.S.2d 338, 344, 244 N.E.2d 37, 41 (1968):

'[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused.' (Citations omitted.)"

Affirming the denial of cross-motions for summary judgment, the court said that, absent a cancellation on six months' notice for which the contract provided: ·

> defendant was expected to continue to perform in good faith and could cease production of the bread crumbs, a single facet of its operation, only in good faith. Obviously, a bankruptcy or genuine imperiling of the very existence of its entire business caused by the production of the crumbs would warrant cessation of production of that item; the yield of less profit from its sale than expected would not. Since bread crumbs were but a part of defendant's enterprise and since there was a contractual right of cancellation, good faith required continued production until cancellation, even if there be no profit. In circumstances such as these and without more, defendant would be justified, in good faith, in ceasing production of the single item prior to cancellation only if its losses from continuance would be more than trivial, which, overall, is a question of fact.

37 N.Y.2d 471–72, 373 N.Y.S.2d 106, 335 N.E.2d 323.[7] Falstaff argues from this that it was not bound to do anything to market Ballantine products that would cause "more than trivial" losses.

■ We do not think the judge imposed on Falstaff a standard as demanding as its appellate counsel argues that he did. Despite his footnote 7, see note 6 *supra,* he did not in fact proceed on the basis that the best efforts clause required Falstaff to bankrupt itself in promoting Ballantine products or even to sell those products at a substantial loss. He relied rather on the fact that Falstaff's obligation to "use its best efforts to promote and maintain a high volume of sales" of Ballantine products was not fulfilled by a policy summarized by Mr. Kalmanovitz as being:

> We sell beer and you pay for it . . . ..
> We sell beer, F.O.B. the brewery. You come and get it.

—however sensible such a policy may have been with respect to Falstaff's other products. Once the peril of insolvency[8] had been averted, the drastic percentage reductions in Ballantine sales as related to any possible basis of comparison, see fn. 5, required Falstaff at least to explore whether

---

**7.** The text of the *Feld* opinion did not refer to the case cited by Judge Brieant in the preceding footnote, *407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corporation,* 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37 (1968), which might suggest a more onerous obligation here. The Court of Appeals there reversed a summary judgment in favor of the defendant, which had discontinued operating the Savoy Hilton Hotel because of substantial financial losses, in alleged breach of a five-year contract with plaintiff wherein the defendant had agreed to use all reasonable efforts to provide the garage with exclusive opportunity for storage of the motor vehicles of hotel guests. Although the court did use the language quoted by Judge Brieant, the actual holding was simply that "an issue of fact is presented whether the agreement did import an implied promise by Savoy to fulfill its obligations for an entire five-year period." 23 N.Y.2d at 281, 296 N.Y.S.2d at 343, 244 N.E.2d at 41.

Other cases suggest that under New York law a "best efforts" clause imposes an obligation to act with good faith in light of one's own capabilities. In *Van Valkenburgh v. Hayden Publishing Co.,* 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972), the court held a publisher liable to an author when, in clear bad faith after a contract dispute, he hired another to produce a book very similar to plaintiff's and then promoted it to those who had been buying the latter. On the other hand, a defendant having the exclusive right to sell the plaintiff's product may sell a similar product if necessary to meet outside competition, so long as he accounts for any resulting losses the plaintiff can show in the sales of the licensed product. *Parev Products Co. v. I. Rokeach & Sons,* 124 F.2d 147 (2 Cir. 1941). A summary definition of the best efforts obligation, cited by Judge Brieant, 454 F.Supp. at 266, is given in *Arnold Productions, Inc. v. Favorite Films Corp.,* 176 F.Supp. 862, 866 (S.D.N.Y.1959), aff'd 298 F.2d 540 (2 Cir. 1962), to wit, performing as well as "the average prudent comparable" brewer.

The net of all this is that the New York law is far from clear and it is unfortunate that a federal court must have to apply it.

**8.** The judge may have unduly minimized this. We cannot agree with his statement, 454 F.Supp. at 267, that even in the winter of 1975 Falstaff "had considerable borrowing capacity" and indeed "did borrow successfully from Mr. Kalmanovitz." The latter was not making a commercial loan but was engaged in a program to take control. However, nothing turns on this.

steps not involving substantial losses could have been taken to stop or at least lessen the rate of decline. The judge found that, instead of doing this, Falstaff had engaged in a number of misfeasances and nonfeasances which could have accounted in substantial measure for the catastrophic drop in Ballantine sales shown in the chart, see 454 F.Supp. at 267–72. These included the closing of the North Bergen depot which had serviced "Mom and Pop" stores and bars in the New York metropolitan area; Falstaff's choices of distributors for Ballantine products in the New Jersey and particularly the New York areas, where the chosen distributor was the owner of a competing brand; its failure to take advantage of a proffer from Guinness-Harp Corporation to distribute Ballantine products in New York City through its Metrobeer Division; Falstaff's incentive to put more effort into sales of its own brands which sold at higher prices despite identity of the ingredients and were free from the $.50 a barrel royalty burden; its failure to treat Ballantine products evenhandedly with Falstaff's; its discontinuing the practice of setting goals for salesmen; and the general Kalmanovitz policy of stressing profit at the expense of volume. In the court's judgment, these misfeasances and nonfeasances warranted a conclusion that, even taking account of Falstaff's right to give reasonable consideration to its own interests, Falstaff had breached its duty to use best efforts as stated in the *Van Valkenburgh* decision, *supra*, 30 N.Y.2d at 46, 330 N.Y.S.2d at 334, 281 N.E.2d at 145.

Falstaff levels a barrage on these findings. The only attack which merits discussion is its criticism of the judge's conclusion that Falstaff did not treat its Ballantine brands evenhandedly with those under the Falstaff name. We agree that the subsidiary findings "that Falstaff but not Ballantine had been advertised extensively in Texas and Missouri" and that "[i]n these same areas Falstaff, although a 'premium' beer, was sold for extended periods below the price of Ballantine," while literally true, did not warrant the inference drawn from them. Texas was Falstaff territory and,

with advertising on a cooperative basis, it was natural that advertising expenditures on Falstaff would exceed those on Ballantine. The lower price for Falstaff was a particular promotion of a bicentennial can in Texas, intended to meet a particular competitor.

However, we do not regard this error as undermining the judge's ultimate conclusion of breach of the best efforts clause. While that clause clearly required Falstaff to treat the Ballantine brands as well as its own, it does not follow that it required no more. With respect to its own brands, management was entirely free to exercise its business judgment as to how to maximize profit even if this meant serious loss in volume. Because of the obligation it had assumed under the sales contract, its situation with respect to the Ballantine brands was quite different. The royalty of $.50 a barrel on sales was an essential part of the purchase price. Even without the best efforts clause Falstaff would have been bound to make a good faith effort to see that substantial sales of Ballantine products were made, unless it discontinued under clause 2(a)(v) with consequent liability for liquidated damages. Cf. *Wood v. Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917) (Cardozo, J.). Clause 8 imposed an added obligation to use "best efforts to promote and maintain a *high* volume of sales . . . ." (emphasis supplied). Although we agree that even this did not require Falstaff to spend itself into bankruptcy to promote the sales of Ballantine products, it did prevent the application to them of Kalmanovitz' philosophy of emphasizing profit *über alles* without fair consideration of the effect on Ballantine volume. Plaintiff was not obliged to show just what steps Falstaff could reasonably have taken to maintain a high volume for Ballantine products. It was sufficient to show that Falstaff simply didn't care about Ballantine's volume and was content to allow this to plummet so long as that course was best for Falstaff's overall profit picture, an inference which the judge permissibly drew. The burden then shifted to Falstaff to

prove there was nothing significant it could have done to promote Ballantine sales that would not have been financially disastrous.

■ Having correctly concluded that Falstaff had breached its best efforts covenant, the judge was faced with a difficult problem in computing what the royalties on the lost sales would have been. There is no need to rehearse the many decisions that, in a situation like this, certainty is not required; "[t]he plaintiff need only show a 'stable foundation for a reasonable estimate of royalties he would have earned had defendant not breached'". *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2 Cir. 1977), quoting *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383, 357 N.Y.S.2d 857, 861, 314 N.E.2d 419, 421 (1974). After carefully considering other possible bases, the court arrived at the seemingly sensible conclusion that the most nearly accurate comparison was with the combined sales of Rheingold and Schaefer beers, both, like Ballantine, being "price" beers sold primarily in the northeast, and computed what Ballantine sales would have been if its brands had suffered only the same decline as a composite of Rheingold and Schaefer.

Falstaff's principal criticism of the method of comparison, in addition to that noted in fn. 5, *supra,* was that the judge erred in saying, 454 F.Supp. at 279, that inclusion of Rheingold made "the comparison a conservative one" since "[t]he brewery was closed in early 1974 and production halted for a time." Falstaff is right that the halt in Rheingold production works the other way since the lowered figure for the base year made the percentage decline in subsequent years appear to be less than it in fact was. Against this, however, is the fact that the Rheingold 1977 figures do not include sales for the end of 1977 after the sale of Rheingold to Schmidt's Brewery, which counterbalances this error in some degree. In any event the Rheingold sales were only 25.7% of the combined sales in 1974 and 16.8% in 1977. Another criticism is that the the deduction from the initial computation of lost royalties of $29,193.50 for the period

April 1976 to March 1978 as representing royalties lost through the cessation of illegal practices was insufficient; it may well have been but the judge used the best figures he had. A possible objection, namely, that Schaefer maintained its sales only by incurring large losses, a fact now possibly subject to judicial notice, see *The F. & M. Schaefer Corporation v. C. Schmidt & Sons, Inc.,* 597 F.2d 814, 817 (2 Cir. 1979), was not advanced with sufficient specificity to have required consideration. It is true, more generally, that the award may overcompensate the plaintiff since Falstaff was not necessarily required to do whatever Rheingold and Schaefer did. But that is the kind of uncertainty which is permissible in favor of a plaintiff who has established liability in a case like this. As said in *Wakeman v. Wheeler & Wilson Mfg. Co.,* 101 N.Y. 205, 209, 4 N.E. 264 (1886):

> [W]hen it is certain that damages have been caused by a breach of contract, and the only uncertainty is to their amount, there can rarely be good reason for refusing on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of damage which he caused is uncertain.

We also reject plaintiff's complaint on his cross-appeal that the court erred in not taking as its standard for comparison the grouping of all but the top 15 brewers, Ballantine having ranked 16th in 1971. The judge was entirely warranted in believing that the Rheingold-Schaefer combination afforded a better standard of comparison.

■ We can dispose quite briefly of the portion of the plaintiff's cross-appeal which claims error in the rejection of his contention that Falstaff's actions triggered the liquidated damage clause. One branch of this puts heavy weight on the word "distribution"; the claim is that the closing of the North Bergen center and Mr. Kalmanovitz' general come-and-get-it philosophy was, without more, a substantial discontinuance of "distribution". On this basis plaintiff

would be entitled to invoke the liquidated damage clause even if Falstaff's new methods had succeeded in checking the decline in Ballantine sales. Another fallacy is that, country-wide, Falstaff substantially increased the number of distributors carrying Ballantine labels. Moreover the term "distribution", as used in the brewing industry, does not require distribution by the brewer's own trucks and employees. The norm rather is distribution through independent wholesalers. Falstaff's default under the best efforts clause was not in returning to that method *simpliciter* but in its failure to see to it that wholesale distribution approached in effectiveness what retail distribution had done.

Plaintiff contends more generally that permitting a decline of 63.12% in Ballantine sales from 1974 to 1977 was the equivalent of quitting the game. However, as Judge Brieant correctly pointed out, a large part of this drop was attributable "to the general decline of the market share of the smaller brewers" as against the "nationals", 454 F.Supp. at 266, and even the 518,899 barrels sold in 1977 were not a negligible amount of beer.

The judgment is affirmed. Plaintiff may recover two-thirds of his costs.