QUANTUM CAPITAL GROUP, INC., Plaintiff,

v.

ISRAMCO, INC., Defendant.

No. 85 Civ. 2134 (EW).

United States District Court, S.D. New York.

July 7, 1986.

Silverman & Digiovanna, New York City, for plaintiff; Kenneth Elan, of counsel.

Greenfield, Eisenberg, Stein & Senior, New York City, for defendant; Norman A. Senior, Elizabeth S. Benson, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff Quantum Capital Group, Inc. ("Quantum"), a New Jersey corporation, commenced this diversity action against Isramco, Inc., a Delaware corporation, for breach of a consulting agreement between the parties. Defendant counterclaimed, alleging that plaintiff breached the agreement by failing to perform consulting services required under the contract and by rendering itself incapable of fulfilling its contractual obligations. Upon consideration of the parties' pre-trial and post-trial submissions, the Court's contemporaneous notes of the trial, as well as an evaluation of the demeanor and credibility of the witnesses, the Court makes the following findings of fact and conclusions of law.

Quantum, a registered broker-dealer, is wholly-owned by Sherwood Capital Group, a holding company formed in 1981 as the parent of both Quantum and Sherwood Securities. Quantum was a retail stock trading operation with offices in Boca Raton and Orlando, Florida, and Denver, Colorado. Defendant Isramco is a publicly held corporation principally engaged in oil exploration in the Middle East.

In August 1983, Quantum was the lead underwriter for a public offering of Isram-

co Stock.[1] On August 23rd, Quantum and Isramco entered into a consulting agreement for a period of 5 years which provides:

FIRST: ... Consultant [Quantum] agrees to perform such financial consulting services as shall from time to time be assigned to it by the President or the Board of Directors of the Company [Isramco] and agrees to provide timely and prompt advice and responses to matters within the scope of this Consulting Agreement when requested by the Company or when deemed by Consultant to be appropriate to be given to the Company....

SECOND: Consultant shall render financial consulting services to the Company including the evaluation of mergers, consolidations and acquisitions, private placements of the Company's securities and other forms of advisory activities with respect to investment banking.

THIRD: The Company shall pay to Consultant and Consultant shall accept from the Company for consulting services during the Consulting Period, compensation at the rate of Eighteen Hundred ($1,800) Dollars per month, payable in advance on the first day of each month, commencing on the date hereof.[2]

It is undisputed that Isramco paid $21,600 to Quantum under the consulting agreement but has made no payments since August 1984.[3]

Quantum contends that there is no justification for Isramco's failure to pay the balance of the monthly payments and seeks to recover all payments due for the remainder of the contract period, a total of $86,-400. In uncontradicted testimony, Charles J. Sheils, president of Quantum until May 1984, testified that when Isramco failed to make the September 1984 payment, he had a series of discussions with counsel for Isramco, who told him that Isramco lacked adequate funds to continue making the payments.

For its part, Isramco contends that it stopped making the monthly payments because plaintiff failed to perform services under the contract and because plaintiff terminated its business operations, rendering itself unable to perform under the contract. Defendant, under a counterclaim, seeks recovery of the payments it made and an additional $4,500, representing monies expended by Isramco when Quantum allegedly failed to perform services in connection with Isramco's 1984 proxy statement.

With respect to its claim that Quantum failed to perform its contractual duties, defendant Isramco makes two independent arguments: that Quantum ignored Isramco's repeated requests for services and that the second paragraph of the consulting agreement imposed an affirmative obligation on Quantum to render services regardless of whether Isramco requested those services. The evidence fails to support either contention.

Sheils testified that he received few requests for services from Isramco and those that he did receive were fulfilled. In particular, Sheils testified that he provided Isramco with one of Quantum's consultants, Alfred Vitalli, in response to Isramco's request for assistance in raising additional capital for the corporation; that when Isramco's chairman and chief executive officer, Joseph Elmaleh, suggested raising capital for Isramco by swapping Israeli bonds for debentures in the company, he placed Elmaleh in contact with Paul Alessandrini, a consultant to Jesup & Lamont; and that Quantum organized and paid for a reception in Denver, Colorado to familiarize Quantum's customers with Isramco. Sheils testified that he received no other requests from Isramco for consulting services. According to Sheils, Isramco never asked Quantum to evaluate a merger, a consolidation, a proposed acquisition or a private placement. Sheils successor as president of Quantum, Murray Seitman,

---

1. *See* Def.'s Exh. B.

2. Pl.'s Exh. 1.

3. *See* Joint Pretrial Order, paras. 7–8.

testified that Isramco has not requested any services since he became president.

Elmaleh disputed each of these statements. Elmaleh claimed that he repeatedly asked Sheils and others at Quantum to perform consulting services for Isramco, but to no avail. While Elmaleh acknowledged that Quantum had performed some services, he minimized the value of those services.

It is upon this direct conflict in the testimony of the officers of the plaintiff and the defendant that the Court must resolve the question of whether Quantum performed the services it was asked to perform. The Court finds that although the services performed by Quantum were not extensive, they were responsive to Isramco's requests. Defendant offered no documentary evidence to support its claim of repeated requests and Elmaleh, an experienced businessman, admitted he had not put any of his alleged requests in writing. Morover, Isramco continued to make monthly payments to Quantum until August 1984, without written protest, despite what it contends was a complete lack of performance by Quantum from the time the contract was signed in August 1983. These factors, as well as the Court's evaluation of the demeanor of the three witnesses, compel the conclusion that plaintiff performed those services it was asked to perform.

Defendant urges the Court to construe the second paragraph of the contract as requiring Quantum to perform financial consulting services irrespective of whether Isramco requested those services. Defendant relies on the fact that the second paragraph states that Quantum "shall" provide financial consulting services and contends that the first and second paragraphs are independent.

Isramco's interpretation of the agreement flies in the face of the contract's clear language and common sense. The contract is a standard retainer agreement whereby one party renders advice or performs services upon request by the other party for a fixed monthly or annual fee. The first paragraph of the contract expressly provides that the consultant agrees to provide advice and responses "to matters within the scope of this Consulting Agreement *when requested* by [Isramco]...." The only provision defining the "scope" of the agreement is the second paragraph, which contains a list of the types of services Quantum must provide if Isramco requests them or if Quantum deems it appropriate to provide them.

Isramco nevertheless argues that the second paragraph imposed on Quantum an independent obligation to search for and evaluate prospective merger and consolidation candidates and to initiate other similar activities. Isramco ignores the fact that nowhere in the contract, which was negotiated by experienced counsel for both sides, is there a provision requiring Quantum to initiate services. The second paragraph simply requires Quantum to *evaluate* proposed mergers, consolidations, acquisitions and private placements, not to *initiate* or *propose* them. Nothing in the testimony of Hal Winkler, a former Quantum employee who participated in discussions with Isramco prior to the signing of the agreement and who testified for Isramco, requires any other finding of Quantum's obligations under the contract.

 Finally, relying on the principle that the contract contained an implied promise to continue in business [4] Isramco argues that plaintiff has ceased operations, rendering itself incapable of performing under the agreement. Isramco points to the fact that Quantum has closed its Florida and Denver offices, and has no separate office, no salaried employees and no income.[5]

The evidence shows that Quantum has not been dissolved and continues to be a registered broker-dealer. The corporation has officers who work out of Sherwood Securities' New Jersey office. Moreover, Quantum has never refused to perform its

---

**4.** *See, e.g., Telecommunications Corp. v. Franchises Int'l,* 332 F.Supp. 469 (S.D.N.Y.1971).

**5.** *See* Def.'s Exhs. D and E.

obligations, despite closing its offices and terminating its paid employees.

Isramco entered into the contract and made monthly payments to Quantum for one year despite the fact that Quantum was a retail trading operation with no investment banking staff or corporate finance department of its own. The ninth paragraph of the Consulting Agreement permits Quantum to assign the contract and nothing in the contract prevents it from delegating its duties to Sherwood Securities or a third party. The contract does not bar Quantum from hiring outside consultants to perform whatever work is required by Isramco. In fact, the services provided by Quantum during 1983 and 1984, for the most part, were performed by outside consultants. The mere fact that Quantum no longer operates its retail trading operation and has no paid employees does not mean that it has rendered itself incapable of continuing to fulfill its obligations, as defined by the parties' contract.

This is not a case like *Telecommunications Corp. v. Franchises International*,[6] or *407 East 61st Street Garage v. Savoy Fifth Avenue Corp.*,[7] relied on by defendant to support its argument that Quantum breached an implied promise to remain in business. In those cases, unlike this case, it was undisputed that the defendant had gone out of business and refused to perform its obligations under the contract. While it cannot be disputed that Quantum is no longer structurally the company it once was, it continues to exist as a viable corporate entity and has not rendered itself incapable of fulfilling its contractual obligations. In fact, the current president of Quantum, Murray Seitman, testified that if requested, consulting services would be provided. The contracts in both cases relied upon by defendant contained "best efforts" claus-

es and, in both cases, the plaintiff had "undertaken certain burdens or obligations in expectation of and reliance upon the promisor's continued activity."[8] The facts of this case do not support similar conclusions.

Based upon the totality of the evidence, the Court finds that defendant breached the Consulting Agreement without justification.[9] Accordingly, plaintiff is entitled to judgment in the amount of $86,400, representing the amount due under the contract from the time of the breach until the contract's expiration. Submit order.

So ordered.

---

6. 332 F.Supp. 469 (S.D.N.Y.1971).

7. 23 N.Y.2d 275, 296 N.Y.S.2d 338, 244 N.E.2d 37 (1968).

8. *407 E. 61st St. Garage*, 23 N.Y.2d at 280, 296 N.Y.S.2d at 342; *Telecommunications Corp.*, 332 F.Supp. at 472.

9. Defendant failed to offer any credible evidence to support its claim that plaintiff was obligated to distribute 1984 proxy materials for defendant and that it failed to do so.