**THE CHASE MANHATTAN BANK, as Indenture Trustee, under the Indenture, Dated as of May 6, 1998, Plaintiff,**

v.

**TRAFFIC STREAM (BVI) IN-FRASTRUCTURE LIMIT-ED, Defendant.**

**No. 99 CIV. 4056(SAS).**

United States District Court, S.D. New York.

Feb. 2, 2000.

Sarah L. Reid, Ari J. Glazer, Kelley, Drye & Warren LLP, New York City, for Plaintiff.

George A. Zimmerman, Shmuel Vasser, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

This is a diversity contract action arising out of a high-yield debt instrument. On May 6, 1998, plaintiff Chase Manhattan Bank ("Chase"), acting as Trustee, and defendant Traffic Stream (BVI) Infrastructure Limited ("Traffic Stream") entered into an Indenture Agreement (the "Indenture") pursuant to which defendant issued 14¼ percent Senior Secured Notes (the "Notes") in an aggregate amount of $119,000,000 to various holders. Traffic Stream issued the Notes to finance a business venture involving the construction of toll roads in the People's Republic of China ("China").

On June 4, 1999, plaintiff commenced this litigation contending that Traffic Stream defaulted on its obligations under the Indenture. Plaintiff seeks, among other things, immediate repayment of defendant's indebtedness including both principal and interest. Plaintiff now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

In its opposition to plaintiff's motion, defendant admits that it defaulted on its obligations under the Indenture. However, defendant argues that its defaults should be excused pursuant to the contract doctrine of "impossibility of performance." Specifically, defendant contends that a change in Chinese policy delayed defendant's recoupment of monies from the toll-road projects, making it "impossible" for defendant to fulfill its payment obligations under the Indenture.

There is no dispute that defendant defaulted on its obligations under the Indenture. Accordingly, the sole issue with respect to summary judgment is whether defendant can, as a matter of law, plausibly maintain an impossibility defense. Because I find that defendant cannot maintain such a defense, and for the reasons set forth below, plaintiff's motion is granted in its entirety.

## I. Jurisdiction

The Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because plaintiff is a corporate citizen of New York, defendant is a corporate citizen of the British Virgin Islands and the matter in controversy exceeds $75,000. Complaint ¶¶ 1–3; Amended Answer ¶¶ 1,3. Moreover, pursuant to section 112 of the Indenture, Traffic Stream explicitly consents to the personal jurisdiction of this Court over "any, suit, action or proceeding . . . brought in connection with th[e] Indenture or the Notes." Indenture, Ex. A to 10/6/99 Affidavit of plaintiff's counsel Sarah Reid ("Reid Aff."), § 112(a).[1]

## II. Background

The following facts are taken from the parties' Rule 56.1 statements and supporting affidavits. Unless otherwise indicated, the facts are undisputed.

### A. Traffic Stream

Traffic Stream is a corporation organized under the laws of the British Virgin Islands. Plaintiff's Rule 56.1 Statement of Undisputed Facts ("Pl.56.1") ¶ 2. Traffic Stream is the parent of four wholly-owned subsidiaries. *Id.* ¶ 4. All four subsidiaries are incorporated in Hong Kong (collectively, the "Hong Kong Subsidiaries"). *Id.* According to defendant, the Hong Kong Subsidiaries are its sole assets and its sole source of income. Defendant's Rule 56.1 Statement of Undisputed Facts ("Def.56.1") ¶ 45.[2]

Through its Hong Kong Subsidiaries, Traffic Stream owns interests in thirteen Chinese-foreign cooperative joint ventures (the "Joint Ventures"). Pl. 56.1 ¶ 3. Each Joint Venture is comprised of a foreign partner—one of the Hong Kong Subsidiaries—and a Chinese partner. Def. 56.1 ¶ 48. The Joint Ventures are engaged in the development, construction and operation of six toll-road projects in China. Pl. 56.1 ¶ 3; Def. 56.1 ¶ 44.

### B. The Indenture

In order to finance the Chinese toll-road projects, Traffic Stream entered into the Indenture with Chase. 11/1/99 Declaration of Wong Kwok Choi, Executive Director of Traffic Stream, ("Wong Decl.") ¶ 4. As set forth above, pursuant to the Indenture, Traffic Stream issued 14¼ percent Notes in an aggregate amount of $119,000,000. Pl. 56.1 ¶ 5. The Notes are due in 2006. *Id.*

---

1. The Indenture also includes a choice of law provision which states: "This Indenture and the Notes shall be governed by and construed in accordance with the laws of the State of New York." Indenture, Ex. A to Reid Aff., § 111. Accordingly, New York law governs the instant dispute.

2. Plaintiff does not concede that the Hong Kong Subsidiaries are defendant's sole assets and sole source of income. *See* Plaintiff's Reply Memorandum of Law in Further Support of its Motion for Summary Judgment ("Pl.Reply") at 2. However, plaintiff accepts defendant's assertion as true for purposes of this summary judgment motion. *Id.*

Under the terms of the Indenture, Traffic Stream is required to make semi-annual interest payments on the Notes. *Id.* ¶ 7. The payments are due in May and November of each year, commencing in November 1998. *Id.*

As collateral for Traffic Stream's payment obligations, the Indenture grants Chase first priority security interests in four accounts maintained by defendant: (i) the Debt Service Reserve Account; (ii) the Construction Funding Account; (iii) the Joint Venture Distribution Account; and (iv) the Note Redemption Account (collectively, the "Collateral Accounts"). *Id.* ¶¶ 7–9. In addition, Traffic Stream executed a Letter of Credit Procurement and Deposit Agreement ("LOC and Deposit Agreement") pursuant to which Traffic Stream promised to deliver a letter of credit in the amount of $8,058,750 to Chase by January 6, 1999.[3] *Id.* ¶ 14; LOC and Deposit Agreement, Ex. B to Reid Aff., § 1. Traffic Stream further promised to replace the letter of credit with cash currency on or before May 6, 1999, by depositing $8,058,750 into the Construction Funding Account. Pl. 56.1 ¶ 15.

Section 501 of the Indenture explicitly states that any failure by defendant to make timely interest payments or to procure the required letter of credit constitutes an "Event of Default". Section 501 provides, in relevant part, as follows:

> "Event of Default", wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):
>
> (1) default in the payment of any interest, including Additional Interest, if any, and Additional Amounts, if any, in respect of interest on any Note when it becomes due and payable and continuance of such default for a period of five Business Days; or
>
> . . . .
>
> (4) the failure to deliver to the Trustee the [letter of credit] on or before January 6, 1999 as provided in the LOC and Deposit Agreement (unless the [cash] Deposit shall have been made on or before January 6, 1999) . . . .

Indenture, Ex. A to Reid Aff., § 501(1),(4). The failure to pay "the principal of or premium, if any, on any Note when it becomes due and payable at its Stated Maturity, or the failure to redeem Notes in the required principal amounts on any Mandatory Redemption Date" is also an Event of Default under section 501. *Id.* § 501(2).

Pursuant to section 502 of the Indenture, if an Event of Default occurs, Chase, as Trustee, or the Note holders may "declare the principal of, premium, if any, and accrued interest on all of the Outstanding Notes immediately due and payable, and upon any such declaration all such amounts payable in respect of the Notes shall become immediately due and payable." *Id.* § 502.[4] The Indenture further

---

3. Technically, Traffic Stream did not itself undertake to procure the required letter of credit. Rather, four additional parties to the LOC and Deposit Agreement—three corporate entities and one individual—agreed to procure and deliver the letter of credit to Chase. LOC and Deposit Agreement, Ex. B to Reid Aff., § 1. The precise nature of the relationship between defendant and the four entities directly responsible for procurement of the letter of credit is unclear from both the face of the LOC and Deposit Agreement and the parties' submissions. However, there is no question that the entities are closely tied to both defendant and the toll-road projects. *Id.* at preamble. Moreover, as discussed *infra*, the failure to deliver the $8,058,750 letter of credit constitutes a default under the Indenture to which only Traffic Stream and Chase are parties. Accordingly, to avoid confusion and for the sake of simplicity, I refer to all obligations under the LOC and Deposit Agreement as "Traffic Stream's" obligations.

4. Specifically, the Indenture allows "the Trustee or Holders of not less than 25% in aggregate principal amount of the Notes Out-

provides that if defendant defaults upon the payment of interest, principal or premium, the defendant must, upon demand by plaintiff, pay the whole amount due plus "such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel." *Id.* § 503.

Finally, section 1009 of the Indenture requires defendant to provide the Trustee with a variety of financial statements and reports. *Id.* § 1009.

### C. Traffic Stream's Defaults Under the Indenture

Traffic Stream timely tendered the first required interest payment on November 1, 1998. Pl. 56.1 ¶ 22. Since that time, however, Traffic Stream has committed multiple defaults under the Indenture.

### 1. Failure to Deliver Letter of Credit

Traffic Stream failed to deliver the required $8,058,750 letter of credit to Chase by January 6, 1999. *Id.* ¶ 24. Such failure constitutes an Event of Default under section 501(4) of the Indenture. *Id.;* Def. 56.1 ¶ 24; Indenture, Ex. A to Reid Aff., § 501(4).[5]

### 2. Failure to Pay Accelerated Principal

On March 24, 1999, holders of more than 25 percent of the Notes delivered to defendant a Declaration of Acceleration (the "Declaration") pursuant to section 502 of the Indenture. Pl. 56.1 ¶ 26. As a result of the Declaration, the Notes became immediately due and payable. The Declaration also demanded, pursuant to section 503, "the immediate payment in full" of the Notes. *Id.* ¶ 27. Despite the acceleration of the Notes and the demand for immediate payment, defendant has failed to pay any amounts on the Notes. *Id.* ¶ 27; Def. 56.1 ¶ 27. Such failure constitutes an Event of Default under section 501(2) of the Indenture. Pl. 56.1 ¶ 28; Def. 56.1 ¶ 28; Indenture, Ex. A to Reid Aff., § 501(2).

### 3. Failure to Pay Interest and Provide Reports

Not only did Traffic Stream fail to honor the holders' demand for "immediate payment in full", it also failed to tender the May 1999 interest payment, which was required even in the absence of the acceleration and demand for payment. Pl. 56.1 ¶ 30. Defendant's failure to make the scheduled interest payment constitutes an Event of Default under section 501(1) of the Indenture. *Id.;* Def. 56.1 ¶ 28; Indenture, Ex. A to Reid Aff., § 501(1).[6]

Finally, Traffic Stream failed to provide certain financial statements and reports to the Trustee as required under section 1009 of the Indenture. Pl. 56.1 ¶ 32.

standing" to accelerate payment. Indenture, Ex. A to Reid Aff., § 502.

**5.** Defendant did deliver a letter of credit in the amount of $4,460,000 to Chase on January 11, 1999. Pl. 56.1 ¶ 25. And, on February 12, 1999, defendant delivered to Chase a second letter of credit in the amount of $1,100,000. *Id.* Not only were these letters of credit untimely, they were also insufficient; combined, the letters were in an amount $2,498,750 less than the amount required under the LOC and Deposit Agreement. *Id.*

Traffic Stream also failed to deposit $8,058,750 cash in the Construction Funding Account by May 6, 1999, as required under the LOC and Deposit Agreement. As a result, plaintiff drew the entire amount available under defendant's January 11 and February 12 letters of credit. Pl. 56.1 ¶ 30. However, because defendant failed to procure letters of credit in the required amount, a balance of $2,498,750 remains unpaid and owing to plaintiff under the LOC and Deposit Agreement. *Id.*

**6.** It appears that Traffic Stream similarly failed to pay the third installment of accrued interest which came due on November 1, 1999, during the briefing of the instant motion. *See* 11/17/99 Affidavit of Francis J. Grippo, a vice president of Chase, ("Grippo Aff.") ¶ 8; Wong Decl. ¶ 23.

## D. Procedural History

In response to defendant's defaults, Chase commenced the instant action on June 4, 1999.[7] The complaint sets forth five claims: (i) breach of contract; (ii) replevin of collateral; (iii) specific enforcement of defendant's reporting obligations; (iv) an accounting; and (v) recovery of costs for collection. Complaint ¶¶ 32–52. With respect to claims one and two, Chase seeks turnover of the Collateral Accounts as well as damages in the form of a deficiency judgment equal to the difference in value between the Collateral Accounts and the total amount of defendant's indebtedness.[8] *Id.* ¶ 52.

Traffic Stream concedes that it is in default under the Indenture as a result of its failure to post the required letter of credit and its failure to make the required payments. Def. 56.1 ¶¶ 24, 27–28. However, Traffic Stream asserts the legal defense of impossibility with respect to claims one and two—breach of contract and replevin of collateral. *Id.* ¶ 37. Traffic Stream does not assert any legal defenses in connection with Chase's claims for specific performance, an accounting or collection costs. *Id.*

## E. Chinese Law and The SAFE Notice

Defendant's impossibility defense to Chase's claims for breach of contract and replevin of collateral is based on an alleged change in Chinese policy regarding remittance of guaranteed funds to foreign investors. According to defendant, the alleged policy change occurred in September 1998.[9]

### 1. The Joint Ventures

The contracts governing the Joint Ventures guarantee the Hong Kong Subsidiaries, as foreign partners, a fixed annual return on their investments in the toll-road projects. Def. 56.1 ¶ 47; Wong Decl. ¶ 3. If the income generated by a Joint Venture (the "Operating Income") is less than the fixed annual rate of return, the Chinese partner is obligated to pay the difference to the foreign partner from its own funds (the "Guaranteed Income"). Def. 56.1 ¶ 48; Wong Decl. ¶ 3. According to defendant, the fixed annual rate of return is sufficient to cover all interest payments due under the Indenture. Wong Decl. ¶ 5.

### 2. Remittance of Income

Distribution of funds from the Joint Ventures to their foreign partners is regulated by Chinese law. Def. 56.1 ¶ 47; Jingtian Associates Opinion Re: Guarantee of Foreign Party's Investment Return ("Jingtian Op."), Ex. A to 11/2/99 Declaration of Zhao Yang ("Zhao Decl."), at 1.[10]

Under Chinese law, remittance of guaranteed income to foreign partners has "consistently" been under the "restriction, supervision and regulation" of the central Chinese Government, specifically China's

---

7. Chase brought suit pursuant to section 503 of the Indenture which authorizes the Trustee to institute a judicial proceeding, in its own name, for the collection of sums due, specific performance of the Indenture or any other appropriate remedy. Indenture, Ex. A to Reid Aff., § 503.

8. According to plaintiff, as of October 31, 1999, defendant's total indebtedness under the Indenture was $137,352,444, including $119,000,000 in principal and $11,312,437 in accrued, unpaid interest. Grippo Aff. ¶ 8. Interest continues to accrue on the Notes at a rate of $55,142 per day. *Id.*

9. Plaintiff does not concede the occurrence of a change in Chinese policy. Pl. Reply at 2.

Indeed, as discussed *infra* Part IV.A., plaintiff contends that defendant's impossibility arguments regarding a change in Chinese policy are based solely on hearsay and should be rejected on that basis alone. *Id.* at 2–3; Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment ("Pl. Mem.") at 11–13.

10. Zhao Yang is defendant's legal counsel "in connection with the laws and regulations of the People's Republic of China." Zhao Decl. ¶ 1. Zhao issued the Jingtian Opinion on behalf of Jingtian Associates, a Beijing law firm. *Id.* ¶ 2.

State Administration of Foreign Exchange ("SAFE").[11] *Id.* In fact, pursuant to a notice issued by SAFE in April 1994, "the Chinese party in a [Chinese-foreign cooperative joint venture] shall not guarantee the foreign party's investment return rate, as it does in loans, bonds, or other forms. The said guarantee of investment return rate cannot be recognized or enforced by relevant Chinese authorities." *Id.*

Despite the central government's longtime prohibition against guaranteed income remitted by Chinese partners to foreign partners, local authorities regularly approved remittance of such income prior to 1998. The Jingtian Opinion explains that

> [a]lthough Chinese party's guarantee of foreign party's investment return rate in [a Chinese-foreign cooperative joint venture] is restricted by the State, such guarantee can possibly still be found in some places in China. Before September 1998, local foreign exchange authorities in some places in China allowed foreign investors in [Chinese-foreign cooperative joint ventures] to remit abroad their income obtained from the said guarantee abroad without obtaining special approval from SAFE.

*Id.* at 2.

In the wake of the 1997 Asian financial crisis, the Chinese Government realized that many foreign investment projects were depleting China's foreign exchange reserve rather than generating income for the State. *Id.* at 2–3; Wong Decl. ¶ 15. This situation was created, in part, by the practice of Chinese partners guaranteeing income to their foreign investment partners. Wong Decl. ¶ 15. To remedy the situation, the Chinese Government strengthened its supervision of foreign exchange and foreign debt. *Id.;* Jingtian Op. at 2–3. Of particular relevance to the instant litigation is a notice issued by SAFE on September 14, 1998 (the "SAFE Notice").[12] Among other things, the SAFE Notice requires "strict supervision of guarantees provided by domestic entities in connection with overseas financing activities of such entities." *See* 9/28/98 People's Daily Newspaper Article ("People's Daily Art."), Ex. A to Declaration of Patricia J. Wang, legal assistant to defendant's counsel Skadden, Arps, Slate, Meagher & Flom ("Wang Decl."), at 4.[13] Pursuant to the SAFE Notice,

> organizations must get ... approval from [SAFE] and file with [SAFE] any required documentation if they need to provide guarantee to support the issuance of overseas debt. If the local government or entity violates [and] provide[s] the guarantee without prior approval, any loan or guarantee agreements shall be invalid, banks shall not open foreign exchange accounts for such guarantee, and the principal and the interest of such foreign debt shall

---

**11.** In contrast, remittance to foreign investors of after-tax profit or dividends may be made without prior approval of SAFE. Jingtian Op., Ex. A to Zhao Decl., at 2.

**12.** As discussed *infra* Part IV.A., the SAFE Notice is a confidential document of the Chinese Government that has not been publicly released. Zhao Decl. ¶ 3. As a result, neither defendant nor plaintiff have reviewed the document. *Id.* Defendant's descriptions of the terms and effects of the SAFE Notice are based on newspaper articles and discussions with Chinese authorities. Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def.Opp.") at 23–24.

**13.** The People's Daily news article was downloaded on September 18, 1999 from the Internet website address of Chinainfobank (www.Chinainfobank.com) by Haoling Liu, a legal assistant in the Beijing office of defendant's counsel Skadden Arps. 10/10/99 Declaration of Haoling Liu ("Haoling Decl.") ¶¶ 1–2. Chinainfobank is a Hong Kong company which provides Chinese Business and legal information to its users. *Id.* ¶ 2. According to Chinainfobank, the news article originally appeared in the September 18, 1998 edition of the People's Daily, the official newspaper of the Chinese Government. *Id.* The article, published in Chinese, was translated into English by Wang of Skadden Arps's New York office. Wang Decl. ¶ 2.

not be permitted to be remitted abroad....

... [T]he entities that have incurred foreign debts will be examined in order to make sure that all foreign debts are properly serviced.

*Id.* According to defendant's legal counsel in China, the practical effects of the SAFE Notice are as follows:

As a result [of the SAFE Notice], income obtained by foreign parties in [Chinese-foreign cooperative joint ventures] from the said guarantee can be remitted abroad *only after obtaining special approval from SAFE,* which may need a comparatively long period of time. Consequently, if the [Joint Ventures are] engaged in such fixed return provided by the Chinese party, remittance of income [to Traffic Stream] from the said guarantee shall need special approval from SAFE.

... Measures taken by the Chinese government in September 1998 to strengthen foreign exchange and foreign debt regulation shall have little material negative impact on [the Joint Ventures] with respect to the remittance of after-tax profit or dividend. However, since the examination has gotten more restrictive, the remittance of profit or dividend will need substantially more time.

Jingtian Op., Ex. A to Zhao Decl., at 3. In other words, the SAFE Notice has "little material negative impact" on the remittance of Operating Income to Traffic Stream. However, the remittance of Guaranteed Income to Traffic Stream requires prior approval from SAFE.

### 3. Effects of SAFE Notice on Traffic Stream

By October 1998, Traffic Stream, through its Hong Kong Subsidiaries, had received income remittances from the Joint Ventures sufficient to cover the November 1998 interest payment. Wong Decl. ¶ 11. On April 27, 1999, in anticipation of the May 3, 1999 interest payment, two Joint Ventures operating toll roads in the Shandong province applied to local authorities for remittance of Guaranteed Income to the Hong Kong Subsidiaries. *Id.* ¶ 14. The local authorities rejected the Joint Ventures' request explaining that, pursuant to the September 1998 SAFE Notice, remittance of Guaranteed Income may only be authorized by SAFE.[14] *Id.* Defendant claims that prior to April 27, 1999, neither defendant nor its subsidiaries was aware of the SAFE Notice. *Id.* ¶ 11.

Upon learning of the policy change, the Joint Ventures together with the local Shandong authorities, contacted SAFE seeking immediate approval for the Joint Ventures' requested remittance of Guaranteed Income. *Id.* ¶ 18. SAFE refused, insisting that the Joint Ventures submit appropriate documentation to SAFE for approval of the toll-road projects. *Id.* According to defendant, SAFE "emphasized that only upon the granting of such reapproval would the Guaranteed Income be permitted to be remitted." *Id.* Although the Joint Ventures continued to lobby local authorities and SAFE for remittance prior to May 3, their efforts proved fruitless. *Id.* ¶¶ 19–20.

On May 16, 1999, the local Shandong authorities approved remittance to the Hong Kong Subsidiaries of the Operating Income for the Shandong Joint Ventures.[15] *Id.* ¶ 20. However, the Operating Income generated by those Joint Ventures prior to May 1999 was insufficient to cover the

---

**14.** *According to defendant, even prior to issuance of the SAFE Notice, it took local authorities approximately two weeks to approve requests for foreign income remittance. Wong Decl. ¶ 8. As a result, even absent the SAFE Notice, it is unlikely that defendant would have received remittance of funds requested on April 27, 1999 by May 3, 1999.*

**15.** *Notably, approval for remittance of Operating Income was granted little more than two weeks after the Joint Ventures submitted their request on April 27. Thus, the SAFE Notice delayed approval for remittance of Operating Income by only a few days. See supra note 14; Wong Decl. ¶ 8.*

required interest payment. *Id.* Since May, the Joint Ventures have persistently requested that local Shandong authorities submit the Shandong toll-road projects to SAFE for approval. *Id.* ¶¶ 21–24. To date, the appropriate documentation has not been submitted to SAFE.[16] *Id.* ¶ 24.

Traffic Stream claims that it "has done and continues doing all that is humanly possible within the framework of the Chinese administrative 'maze' to obtain approval for remittance of the Guaranteed Income." *Id.* ¶ 26. According to Traffic Stream, "[t]he regulatory and policy changes in [China] were completely beyond [defendant's] control and not within its reasonable anticipation." *Id.* ¶ 29. ·

### III. Applicable Legal Standard

A motion for summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law. A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir.1999) (internal quotations and citations omitted).

In assessing the record to determine whether genuine issues of material fact are in dispute, courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.

1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). However, if the moving party meets its initial burden, the non-moving party cannot rely upon conclusory allegations or speculation to create factual disputes. Instead, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998)(internal quotations and citations omitted)(alteration in original).

### IV. Discussion

As set forth above, the sole issue to be resolved on summary judgment is whether defendant can plausibly maintain an impossibility defense based upon what it alleges is a change in Chinese policy regarding remittance of guaranteed income to foreign investors. Plaintiff contends that summary judgment is appropriate for three reasons.

*First*, plaintiff argues that evidence regarding the SAFE Notice cannot be used to defeat summary judgment because such evidence is inadmissible hearsay. *Second*, plaintiff claims that the express language of the Indenture precludes defendant from asserting an impossibility defense. *Third*, plaintiff contends that even assuming defendant's impossibility defense is not explicitly barred by the Indenture, defendant cannot make a legal showing of impossibility. Plaintiff's arguments are discussed in turn below.

### A. Admissibility of Evidence Surrounding SAFE

Defendant's impossibility defense is premised on the SAFE Notice. As set

---

16. The SAFE Notice primarily affects the two Shandong Joint Ventures because those Joint Ventures have consistently failed to generate Operating Income sufficient to fund their for-

eign partners' fixed annual return. Wong Decl. ¶ 16. As a result, the Chinese partners for those particular Joint Ventures must make up the shortfall through Guaranteed Income.

forth above, however, the SAFE Notice is a confidential document of the Chinese government. *See supra* note 12; Zhao Decl. ¶ 3. Defendant does not possess— and cannot produce—a copy of the SAFE Notice. Zhao Decl. ¶ 3. Instead, defendant has provided Chase and this Court with a People's Daily newspaper article and an opinion by Chinese legal counsel describing "the [SAFE] Notice and its resulting consequences." Def. Opp. at 22.

Plaintiff contends that the People's Daily article is inadmissible hearsay because it is being proffered for the truth of its contents. *See* Pl. Reply at 7. Plaintiff argues that hearsay evidence that is not admissible at trial cannot be used to defeat a motion for summary judgment. *Id.* Plaintiff also complains that the Jingtian Opinion "is opaque at best as to what the SAFE Notice actually is intended to do." Pl. Mem. at 12. Stated succinctly, it is plaintiff's position that "[w]ithout providing the underlying [SAFE] Notice which is the foundation for its claim that a change in Chinese law made performance impossible, Traffic Stream cannot escape" an adverse ruling. *Id.* at 11.

It is well-settled that inadmissible hearsay evidence cannot be used to create an issue of fact on summary judgment. *See McNamara v. Guazzoni*, 99 Civ. 4058, 1999 WL 322648, *3 (S.D.N.Y. May 20, 1999). There is no question that the People's Daily article is hearsay; it is an out-of-court, unsworn statement being offered for the truth of its contents. *See* Fed. R.Evid. 801. However, that the article is hearsay does not necessarily mean it is inadmissible. There are numerous exceptions to the general rule barring hearsay evidence at trial.

▉ Federal Rule of Evidence 807 sets forth a residual hearsay exception that is applicable to the instant case. Rule 807 provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

The People's Daily article is offered as evidence of a material fact, namely a change in Chinese policy which rendered defendant's performance under the Indenture impossible. It is also the most probative evidence of the SAFE Notice that defendant can reasonably procure in light of the fact that the SAFE Notice has not been publicly released by the Chinese Government. Similarly, because the SAFE Notice is itself unavailable, the interests of justice would be best served by admission of the article. A large sum of money is at stake in this litigation, and defendant's sole defense is based on the SAFE Notice. To preclude the article would bar defendant from even trying to prove a defense of impossibility.

Finally, the People's Daily article has sufficient guarantees of trustworthiness. The People's Daily is published by the Chinese Communist Party's Central Commission, and it "is deemed to be authoritative and representing the official opinion of the Chinese Government." Haoling Decl. ¶ 2. In other words, there is little risk that a government controlled newspaper such as the People's Daily would inaccurately reflect the official position of its government. Accordingly, the People's Daily article may properly be considered on summary judgment, and defendant's impossibility defense is not precluded simply because the SAFE Notice is unavailable.[17]

---

17. Rule 807 also includes the following notification requirement:

[A] statement may not be admitted under this exception unless the proponent of it

Plaintiff further argues, with reasonable basis, that the Jingtian Opinion is "opaque". Both the newspaper article and the legal opinion are less than models of clarity. That said, the terms and effects of the SAFE Notice are set forth with sufficient clarity for plaintiff to rebut, and for the Court to evaluate, the merits of defendant's impossibility defense.

## B. Impossibility of Performance

Defendant argues that its defaults should be excused pursuant to the doctrine of impossibility, because a change in Chinese policy—the issuance of the SAFE Notice—has delayed Traffic Stream's ability to collect monies from the toll-road projects, making it "impossible" for Traffic Stream to fulfill its payment obligations under the Indenture. *See* Def. Opp. at 11.

 Impossibility is a common law contract doctrine which excuses performance under very limited and narrowly-defined circumstances. *See Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 902, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987)(impossibility has been "applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances"). In *Kel Kim*, the New York Court of Appeals explained the impossibility defense as follows:

Impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible. Moreover, the impossibility must have been

produced by an unanticipated event that could not have been foreseen or guarded against in the contract.

*Id.* Under New York law, where "the risk which causes the alleged impossibility of performance is foreseen, accounted for, and allocated in the contract, failure to perform cannot be excused." *Bank of Am. Nat'l Trust & Savs. Assoc. v. Envases Venezolanos, S.A.*, 740 F.Supp. 260, 267 (S.D.N.Y.1990).

Plaintiff argues that defendant's impossibility defense must fail as a matter of law, both because it is precluded by the plain language of the Indenture and because defendant cannot make a showing of impossibility.

### 1. Impossibility Defense Barred by Indenture

Plaintiff contends that section 501 of the Indenture expressly bars defendant from asserting any impossibility defense based upon a change in Chinese law. As set forth above, the preamble to section 501 states:

"Event of Default", wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court *or any order, rule or regulation of any administrative or governmental body* )
. . . .

Indenture, Ex. A to Reid Aff., § 501 (emphasis added); *see also supra* Part II.B. According to plaintiff, section 501 anticipates the possibility that government action might cause an event of default, and it

makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.
Fed.R.Evid. 807. On September 21, 1999, Traffic Stream provided Chase with an untranslated copy of the People's Daily article.

*See* 9/21/99 letter from defendant's counsel Shmuel Vasser to plaintiff's counsel Sarah Reid, Ex. 6 to Reid Aff. On September 28, 1999, Traffic Stream provided Chase with a translated copy of the article. *See* 9/28/99 facsimile from Vasser to Reid, Ex. 7 to Reid Aff. Clearly, defendant has "made known" its intention to offer the People's Daily article sufficiently in advance of any potential hearing or trial in this matter.

assigns the risk of such government-induced default to defendant. *See* Pl. Mem. at 20.

The preamble of section 501 quoted above is identical to section 501 of the Model Debenture Indenture Provision. *See* Model Debenture Indenture Provision § 501 (1965). According to the American Bar Foundation Commentaries on the Model Debenture Indenture Provisions ("Model Indenture Commentaries"), "[t]he parenthetical clause in the first sentence of Section 501 has the purpose of refuting any argument that events resulting from *force majeure* were not intended to be treated as defaults." American Bar Foundation, Corporate Debt Financing Project, Commentaries on Model Debenture Indenture Provisions 205 (1971) (emphasis in original). Plaintiff cites the Model Indenture Commentaries as further support for its contention that section 501 assigns the risk of adverse government action to defendant, and thus precludes defendant's impossibility defense. *See* Pl. Mem. at 20.[18]

### a. Section 501 Interpreted as a Matter of Law

In a contract dispute, summary judgment may be granted where the relevant contract language is unambiguous and conveys a definite meaning. *See Sayers v. Rochester Tele. Corp. Supplemental Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993). Ambiguity is a question of law to be determined by the court. *See id.*; *Thomas De La Rue AG v. United States Banknote Corp.*, 979 F.Supp. 968, 971

(S.D.N.Y.1997). Contract language is ambiguous where

> it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992) (internal quotations omitted). In contrast, contract language is unambiguous where it "has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion." *Id.* (alteration in original). Moreover, contract language "is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning." *Id.* (internal quotations omitted) (alteration in original).

Moreover, section 501 is a "boilerplate" indenture provision. *See Sharon Steel Corp. v. The Chase Manhattan Bank*, 691 F.2d 1039, 1048 (2d Cir.1982) (defining "boilerplate" provisions as "contractual provisions which are standard in a certain genre of contracts" such as indentures); *see also* Model Debenture Indenture Provision § 501. The Second Circuit has long held that the meaning of "boilerplate" provisions should be determined by courts as a matter of law. *See id.*[19]

---

**18.** Section 501 is the only provision in the indenture that addresses force majeure events. The Indenture does not include a force majeure clause. Defendant's argument to the contrary is discussed *infra* Part IV. B.1.b.

**19.** In *Sharon Steel Corp.*, the Court of Appeals stated:

> Boilerplate provisions are ... not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties

to an indenture. There are no adjudicative facts relating to the parties to the litigation for a jury to find and the meaning of boilerplate provisions is, therefore, a matter of law rather than fact.

Moreover, uniformity in interpretation is important to the efficiency of capital markets.... [T]he creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets.... Just such uncertainties would be created if in-

### b. Section 501

■ Under the plain language of section 501, the failure to tender a required payment constitutes an Event of Default, regardless of whether that failure was caused by a change in government policy. As plaintiff persuasively argues, the Indenture anticipates the risk of adverse government action, and it assigns that risk to defendant. *See* Pl. Mem. at 20; Model Indenture Commentaries 205. Accordingly, defendant's impossibility defense based on the SAFE Notice is precluded by the unambiguous terms of the Indenture.[20] *See Venezolanos,* 740 F.Supp. at 267 (barring defendant's impossibility defense where contract allocated risk that created the impossibility to defendant). Defendant's arguments to the contrary are inconsistent with the language of the Indenture, the Model Indenture Commentaries and general principles of contract law.

*First,* defendant draws a distinction between the issue of whether a default has occurred and the issue of whether a default is excused. *See* Def. Opp. at 15. According to defendant, section 501 determines only that a default has occurred; it does not address whether a particular default is excused pursuant to impossibility. *See id.* Thus, although defendant admits that its failure to make the required payments is an Event of Default under section 501, defendant claims that the language of section 501 regarding government action does not preclude its impossibility defense. Defendant's position is untenable.

■ In the instant case, defendant's distinction between an "occurrence of default" and an "excuse of default" is nothing more than a sleight-of-hand word game. Properly characterized, defendant is arguing that although Traffic Stream's failure to perform due to the SAFE Notice constitutes an "Event of Default", that default is excused because of the SAFE Notice. *See id.* at 15–16. This argument, however, renders the preamble clause of section 501 meaningless. If government action and other force majeure events can excuse a default under the Indenture, then section 501's clear instruction—that even if defaults are caused by force majeure events, they are to be treated as defaults—has no effect. *See* Model Indenture Commentaries 205 (section 501 "has the purpose of refuting any argument that events resulting from *force majeure* were not intended to be treated as defaults"). Defendant's reading of section 501 violates a basic tenet of contract law, namely that "[i]n construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless." *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.,* 63 N.Y.2d 396, 482 N.Y.S.2d 465, 468, 472 N.E.2d 315 (1984).

Defendant's theory similarly ignores the undisputed fact that section 501 is a triggering provision for the comprehensive scheme of default remedies set forth in the ·contract. That is, once defendant's failure to perform is classified as an Event of Default under section 501, plaintiff may take advantage of all available remedies under the Indenture, including litigation. *See, e.g.,* Indenture, Ex. A to Reid Aff., §§ 502, 503. The interplay between section 501 and the remedy provisions further highlights defendant's strained interpretation of section 501. Under defendant's theory, even though Traffic Stream's failure to perform due to the SAFE Notice is an Event of Default such that plaintiff may commence litigation, the SAFE Notice may be used as a defense to that litigation.

terpretation of boilerplate provisions were submitted to juries sitting in every judicial district in the nation.
691 F.2d at 1048.

**20.** This Court makes no finding as to whether the Indenture precludes an impossibility defense based on a force majeure occurrence not explicitly set forth in the preamble to section 501. There is no need to reach this issue because it is undisputed that the SAFE Notice falls within the language of the preamble as an "order, rule or regulation of … a governmental body". Indenture, Ex. A to Reid Aff., § 501.

This is a flawed argument that cannot be reasonably supported by the plain language of the Indenture. As plaintiff explains: "It makes no sense whatsoever as a matter of contract construction for a default based upon a change in law or governmental act to be explicitly identified as an Event of Default so as to bring suit against the Issuer, if the defendant could then simply claim that this same change of law also excused its defaults for which it has been sued." Pl. Mem. at 8.

*Second*, defendant claims that section 514 of the Indenture is a general waiver provision "dealing with *force majeure* type defenses". Def. Opp. at 19 (emphasis in original). Defendant argues that because section 514 does not waive impossibility, impossibility is an available defense under the Indenture, regardless of the plain language of section 501. *See id.* Defendant's argument is puzzling to say the least, considering that section 514 is not a general waiver provision nor does it in any way address events of default or force majeure type defenses.

Section 514, entitled "Waiver of Stay or Extension Laws", states:

> The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully

do so) hereby expressly waives all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Indenture, Ex. A to Reid Aff., § 514. Stay or extension laws such as a stay of foreclosure or a stay of execution are procedural protections "designed for the relief of debtors, in times of general distress or financial trouble". *See* Black's Law Dictionary 983 (6th ed.1990). Thus, section 514 is nothing more than an affirmative agreement by defendant to forgo the benefit of any applicable stay or extension laws. It is not a general waiver of contractual defenses.

Moreover, defendant's claim that section 514 is "the specific section dealing with *force majeure* type defenses", Def. Opp. at 19, is absurd. A force majeure clause "excus[es] nonperformance due to circumstances beyond the control of the parties." *Kel Kim*, 70 N.Y.2d at 903, 524 N.Y.S.2d 384, 519 N.E.2d 295. Section 514 has nothing to do with nonperformance, let alone nonperformance beyond the defendant's control.[21]

The bottom line is that defendant cannot escape the plain language of section 501 which demands performance regardless of whether such performance is rendered "impossible" by an uncontrollable act such as a change of law. Defendant is a sophisticated company involved in high-risk busi-

---

**21.** A comparison of section 514 and a classic force majeure clause further demonstrates the absurdity of defendant's argument. Set forth below is the force majeure provision at issue in *Kel Kim:*

> If either party to this [agreement] shall be delayed or prevented from the performance of any obligation through no fault of their own by reason of labor disputes, inability to procure materials, failure of utility service, restrictive governmental laws or regulations, riots, insurrection, war, adverse weather, Acts of God, or other similar causes beyond the control of such party, the

> performance of such obligation shall be excused for the period of the delay.

70 N.Y.2d at 902 n.*, 524 N.Y.S.2d 384, 519 N.E.2d 295. Clearly, section 514 is not a force majeure clause nor does it address force majeure defenses. What is interesting, however, are the similarities between section 501 and the *Kel Kim* force majeure provision. Essentially, they are mirror images. The *Kel Kim* provision sets forth force majeure events that excuse performance, while section 501 sets forth force majeure events that do not excuse performance.

ness ventures. Defendant could have included a force majeure provision in the indenture, but it failed to do so. Instead, defendant entered into an agreement that explicitly precludes force majeure events as a defense to full performance.

### 2. No Showing of "Impossibility"

Assuming arguendo that section 501 does not itself bar defendant's claim of impossibility, defendant's claim must still fail because defendant cannot, as a matter of law, meet the requirements of an impossibility defense. I note at the outset, that parties attempting to invoke impossibility of performance have an uphill battle. New York courts have been consistently hostile to the defense, allowing it to excuse performance only in the most extreme circumstances.

### a. Objectively Impossible

██ As set forth above, the first element of an impossibility defense is a showing by defendant that performance has been rendered objectively impossible: "Impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible." *Kel Kim*, 70 N.Y.2d at 902, 524 N.Y.S.2d . 384, 519 N.E.2d 295; *see also 407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp.*, 23 N.Y.2d 275, 281, 296 N.Y.S.2d 338, 244 N.E.2d 37 (1968)("[I]mpossibility of performance is limited to the destruction of the means of performance by an act of God, vis major, or by law.").

██ Of particular relevance to this case is the well-settled rule in New York that " 'where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused.' " *Venezolanos*, 740 F.Supp. at 267 (quoting

*407 East 61st Garage*, 23 N.Y.2d at 281, 296 N.Y.S.2d 338, 244 N.E.2d 37); *see also Barclays Bus. Credit, Inc. v. Inter Urban Broad. of Cincinnati, Inc.*, 90 Civ. 2272, 1991 WL 258751, *8 (S.D.N.Y.1991)(finding that "New York law is absolutely clear" regarding rule that impossibility cannot be premised on financial hardship, no matter how severe). Moreover, even where the financial hardship is caused by a government policy, performance cannot be excused as "impossible": "[A]bsent an express contingency clause in the agreement allowing a party to escape performance under certain specified circumstances, compliance is required even where the economic distress is attributable to the imposition of governmental rules and regulations or the inability to secure financing." *Stasyszyn v. Sutton E. Assocs.*, 161 A.D.2d 269, 555 N.Y.S.2d 297, 299 (1st Dep't 1990).

██ Defendant's allegations of impossibility fall squarely within this line of "financial hardship" cases. According to defendant,

> [i]t is undisputed that as a result of the regulatory changes in China, Traffic Stream's only source of income—the remittance of guaranteed payments by Chinese joint venture partners—has dried up. Thus, the regulatory change, which indisputably has delayed the ability to collect guaranteed payments out of China, has made it impossible for Traffic Stream to make the required payments within the time frames set forth in the Indenture.

Def. Opp. at 11. Stripping away the conclusory language, Traffic Stream merely alleges that the SAFE Notice has "delayed" its ability to collect payments from the Joint Ventures, leaving Traffic Stream without enough money to meet its financial obligations. However, lack of funds, "even to the extent of insolvency or bankruptcy", can never excuse contractual performance. *Venezolanos*, 740 F.Supp. at 267 (internal quotations omitted).[22]

---

**22.** From a common sense perspective, mere financial hardship can never support a claim

`of "objective" impossibility because it is caused by "subjective" factors unique to the

Defendant concedes, as it must, that the SAFE Notice merely "delays" rather than prohibits the remittance of funds from the Joint Ventures to Traffic Stream. According to defendant's Chinese legal counsel, the SAFE Notice has "little material negative impact" on the remittance of Operating Income to Traffic Stream. *See* Jingtian Op., Ex. A to Zhao Decl., at 3. Indeed, on May 16, 1999, local Shandong authorities approved remittance to the Hong Kong Subsidiaries of the Operating Income for the Shandong Joint Ventures. *See* Wong Decl. ¶ 20. The SAFE Notice delayed that approval by only a few days. *See id.* ¶ 8. Similarly, the SAFE Notice does not preclude the remittance of Guaranteed Income. Rather, it requires that such remittance be approved by SAFE. *See* Jingtian Op., Ex. A to Reid Aff., at 3.

Of course, as set forth above, the practical effects of the SAFE Notice are legally irrelevant to defendant's impossibility defense. To use plaintiff's words: "The SAFE Notice is not a law or regulation that prohibits, delays or affects the legal ability of Traffic Stream, a British Virgin Islands corporation, from making the required payments, and therefore cannot excuse its failure to perform." Pl. Reply at

4. Put simply, Traffic Stream borrowed $119,000,000 from the United States markets based on its unconditional promise to pay. That Traffic Stream now claims it has no money, whatever the reason, cannot as a legal matter support a claim for objective impossibility. *See Stasyszyn,* 555 N.Y.S.2d at 299. Indeed, to excuse Traffic Stream's performance under these circumstances would open the floodgates and undermine our system of financial contracting.[23]

### b. Foreseeability

■ To succeed on an impossibility defense, not only must performance be objectively impossible, but "the impossibility must have been produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Kel Kim,* 70 N.Y.2d at 902, 524 N.Y.S.2d 384, 519 N.E.2d 295. Because defendant cannot make a showing of objective impossibility, the Court need not reach this second prong. However, for the sake of thoroughness, I briefly address the issue.

Traffic Stream argues that it "did not foresee" the actions of the Chinese Gov-

---

financially distressed entity. In other words, although Traffic Stream itself did not have enough money to make payments under the Indenture, dozens of other companies with adequate financial resources could have easily made the required payments. Financial hardship means that the distressed individual is unable to make payments under a contract. It does not mean that the contract is incapable of being performed.

**23.** Defendant cites a number of cases to support its claim that the SAFE Notice renders Traffic Stream's performance under the Indenture impossible. However, all of the cases defendant cites are distinguishable from the instant case in that they involve government or judicial action that either directly restricted performance under a contract or substantially altered the terms of the contract. For example, in *Studio 54 Disco, Inc. v. Pee Dee Jay Amusement Corp.,* 81 A.D.2d 911, 439 N.Y.S.2d 395 (2d Dep't 1981), the court denied plaintiff's motion for summary judgment where defendant was unable to complete a

required sale of property due to a judicial order explicitly restricting the sale of the property. In that case, neither defendant nor anyone else could perform under the contract due to the court order. Thus, performance was "objectively impossible."

In *Moyer v. City of Little Falls,* 134 Misc.2d 299, 510 N.Y.S.2d 813 (Sup.Ct. Herkimer Co.1986), plaintiff entered into a five-year sanitation contract with the defendant city. The contract price was based on plaintiff's ability to dump refuse at a local landfill for $1.50/cubic yard. *See id.* at 814. Less than a year later, the state closed the local landfill creating a landfill monopoly. *See id.* The monopolist increased the dumping price by 666% within a one-year time period. *See id.* at 815. Because the terms of the contract were fundamentally altered, the court held that plaintiff's performance was excused under the doctrine of impossibility. *See id.* Unlike the contract in *Moyer,* the terms of the Indenture have not changed. They are exactly the same now as they were when defendant entered into the agreement on May 6, 1998.

ernment, nor could it "have reasonably contemplated them." Def. Opp. at 9. In support of its argument, Traffic Stream has submitted a declaration from Traffic Stream's Executive Director, Mr. Wong. In his declaration Mr. Wong states:

> The [Chinese] government has, during the recent years given high priority to the development of transportation infrastructure.... It is envisaged that more and more toll road projects in [China] will be funded by international financial institutions, foreign government loans, and various other sources of the global capital market.

> Against this platform, [Traffic Stream] has never expected that the [Chinese] government would stage any new policies or regulations to the contrary, nor could it.

> The regulatory and policy changes in [China] were completely beyond [Traffic Stream's] control and were not within its reasonable anticipation.

Wong Decl. ¶¶ 27–29. Mr. Wong has also attached several newspaper articles discussing China's commitment to development of a transportation infrastructure through foreign investment. *See id.* at Ex. D.

As set forth *supra* Part IV.B.1.b., section 501 anticipates the possibility that government action might cause an event of default, and it assigns the risk of such government-induced default to defendant. Thus, pursuant to section 501, not only was the Chinese government's action foreseeable, it was foreseen and expressly provided for in the contract.

However, assuming arguendo that section 501 does not address adverse government action, the issue of whether the SAFE Notice could have been foreseen and guarded against is a question of fact. Although just barely, Mr. Wong's declaration and attachments raise an issue of fact that cannot be resolved on summary judgment.

That said, I find it highly implausible that sophisticated companies involved in foreign business ventures in China—business ventures that are intertwined with the State and local governments—"could not have foreseen the possibility" that the Chinese Government might pass unfavorable foreign exchange or foreign investment regulations. Business ventures involving foreign governments and foreign corporations are always fraught with risk. However, business ventures in a communist state that is just warming to the foreign capital markets seems a particularly risky undertaking.

Moreover, despite China's announced commitment to foreign investment, there were signs of trouble well in advance of the parties' execution of the Indenture. Defendant's own expert references the 1997 Asian financial crisis stating: "I believe that the adoption of the [SAFE] Notice by the [Chinese Government] is in response to the 1997 Asian financial crisis and to strengthen the control on foreign exchange." Zhao Decl. ¶ 4.

\*　　\*　　\*　　\*　　\*　　\*

For the reasons set forth above, I find that defendant's impossibility defense is precluded by the plain language of section 501 of the Indenture. Moreover, I find that even absent the provisions of section 501, defendant has not made a sufficient legal showing of impossibility. Accordingly, plaintiff's motion for summary judgment is granted with respect to its claims for breach of contract and replevin of collateral (claims one and two).

## V. Additional Claims

As set forth above, plaintiff also seeks summary judgment with respect to its claims for specific performance, an accounting and reasonable attorneys' fees.

### A. Reporting Obligations

Plaintiff seeks specific performance of defendant's reporting obligations under section 1009 of the Indenture. As set

forth above, the Indenture authorizes Chase to bring suit for "specific performance of any covenant or agreement in the Indenture." Indenture, Ex. A Reid Aff., § 503.

In its opposition, defendant concedes that it is "bound by its contractual obligations to provide Chase with the reports required by the Indenture." Def. Opp. at 25. Accordingly, plaintiff's motion for summary judgment is granted with respect to its claim for specific performance (claim three), and defendant is hereby directed to provide Chase with the required financial reports.

### B. Accounting

In claim four of the complaint, plaintiff seeks an accounting. However, because plaintiff is entitled to specific performance of defendant's financial reporting obligations under section 1009 of the Indenture, including audited financial statements, *see supra* Part V.A; Indenture, Ex. A to Reid Aff., § 1009, plaintiff's additional request for an accounting is moot.

### C. Collection Costs

Plaintiff seeks collection costs in the form of reasonable attorneys' fees pursuant to section 503 of the Indenture. *See* Pl. Mem. at 24. Section 503 requires defendant to pay the Trustee "such further amount as shall be sufficient to cover the costs and expenses of collection, *including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.*" Indenture, Ex. A to Reid Aff., § 503 (emphasis added).

Under New York law, "[r]easonable attorneys' fees are properly awarded when authorized by agreement." *Granada Condominium I v. Morris*, 225 A.D.2d 520, 639 N.Y.S.2d 91, 93 (2d Dep't 1996). Moreover, defendant does not oppose plaintiff's request for attorneys' fees.

Therefore, plaintiff is entitled to reasonable attorneys' fees and should submit its request for such fees no later than February 18, 2000.

### VI. Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is granted in its entirety.[24] Plaintiff is directed to foreclose on the Collateral Accounts and to submit a request for a deficiency judgment by February 18, 2000.

Defendant must provide the required financial reports to plaintiff by February 18, 2000. Once the Court sets reasonable attorneys' fees, the parties are directed to prepare a final judgment.

SO ORDERED:

---

**24.** Plaintiff's motion is granted in its entirety with the exception that plaintiff's request for an accounting is denied as moot. *See supra* Part V.B.