STRINE, Chief Justice,
dissenting:
The world can look much different depending on the lens through which you view it. That is certainly the case when you are a judge or a jury. And the lens that a judge uses when he determines whether a party has breached a contract and caused harm is supposed to influence how he assesses the evidence before him. In the parlance of judges, the terms “burden of proof’ and “standard of review” refer to *276 the pair of glasses you wear to decide a case.
In this case, there is no doubt that the Court of Chancery acted with its historic diligence in addressing expedited litigation involving a huge record with rapid speed and issuing a thoughtful, careful decision. My friends in the Majority affirm the outcome of that decision, even though they concede that the Court of Chancery did not view the case through the appropriate lens.[42] The Court of Chancery’s decision focuses intently on one issue, whether the person I will call the “Latham Tax Lawyer” was honest when he said he could not give the required tax opinion. But, that was not the relevant issue. The fact that the Latham Tax Lawyer did not give the required tax opinion was not contested. If it had been the central issue, there would not have been a case. The question was why the Latham Tax Lawyer did not give the required opinion, and that was not a question centrally dependent on his state of mind, as if he was the defendant in a fraud trial.
The Majority admits that the Court of Chancery did not analyze that question of why the Latham Tax Lawyer did not give the required opinion in the appropriate manner.[43] The need for the opinion came about when an oil and natural gas pipeline operator, ETE, agreed to buy another pipeline operator, Williams. They signed a merger agreement on September 28, 2015. Like the Majority, I refer to that agreement as the “Merger Agreement.” I also use “721 opinion” the way the Majority does, to refer to an opinion by the Latham Tax Lawyer, required by the Merger Agreement as a condition to closing, that the transfer of Williams’ assets in exchange for partnership units “should” be a tax-free exchange under Section 721(a) of the Internal Revenue Code.
The Merger Agreement imposed a specific duty on ETE in connection with the 721 opinion, which was to use “commercially reasonable” efforts to obtain the opinion.[44] That is an affirmative covenant and a comparatively strong one.[45] Instead of determining whether ETE in fact used commercially reasonable efforts to obtain the 721 opinion, the Court of Chancery focused on whether ETE had somehow prevented the Latham Tax Lawyer from giving the 721 opinion,[46] and concluded that, although ETE had certainly not desired the 721 opinion because it wished to get out of the deal, ETE had not coerced or misled La-tham to prevent the issuance of that opinion.[47]
The Court of Chancery, applying an understandable reluctance to call the Latham Tax Lawyer dishonest or a bad man, ac *277 cepted his testimony, that he just could not get to the point where he could give the opinion.[48] That was so even in a context where Latham had indicated at the time the Merger Agreement was signed—indeed for the six months up until the moment ETE contacted it—that it was ready, based on what it knew, to give the required 721 opinion.[49] That in a context where the most central consideration terms in the Merger Agreement used an exchange ratio trading a fixed amount of cash for a fixed amount of stock—stock that tracked the performance of ETE, the value of which could obviously move based on evolving economic conditions, including the market’s assessment of the transaction itself. The consideration portion of a definitive acquisition agreement like the Merger Agreement here is about as fundamental as it gets,[50] and Latham never claimed not to know the amount of shares to be exchanged for cash was fixed. And the public disclosures of the deal described this structure.[51] As the Majority[52] and the Court of Chancery[53] acknowledge, ETE itself also represented and warranted that it knew of nothing that would prevent La-tham from issuing the 721 opinion.[54] Fairly read, this means that ETE had no reason to believe that the structure of the deal’s exchange provisions would give rise to a challenge to its tax-free treatment. So, if, as ultimately happened, the Latham Tax Lawyer was unable to issue the 721 opinion based on his post-signing recognition of facts known pre-signing, a condition would have failed, quite unexpectedly and with more than the whiff of either a lack of care or less innocent causal factors, including improper client pressure. Stuff like this happens in complex mergers. But, what also typically happens then is that both parties work together to resolve those problems in good faith. If one party does not, and that party also committed to a particular level of effort to fulfill such conditions, that may constitute a covenant breach.
As the Majority notes, under our law if a party establishes a breach of a covenant to bring about a condition at closing, the burden is on the breaching party to show that the breach did not materially contribute to the failure of that closing condition.[55] In this context, where the Merger Agreement’s “commercially reasonable efforts” term obligated ETE to take affirmative steps to make sure the 721 opinion condition was satisfied and, instead, ETE did not, ETE must then prove that the 721 opinion condition would not have been sat *278 isfied had it acted appropriately.[56] In lieu of applying this framework, the Court of Chancery focused on whether the Latham Tax Lawyer was honest in saying he could not give the 721 opinion. Admittedly, the Court of Chancery opinion contained a cursory paragraph, consigned to a footnote, that said the record was “barren of any indication” that ETE’s action or inaction materially contributed to the Latham Tax Lawyer’s inability to issue the 721 opinion.[57]
But, I do not believe that the footnote saying that if the Court of Chancery had properly placed this burden on ETE, then the case would have come out the same way, is a substitute for a proper analysis.[58] The Latham Tax Lawyer was put in an extremely awkward position by the manner in which the potential 721 opinion issue was flagged by ETE itself and by ETE’s conduct after it asked the Latham Tax Lawyer to rethink his position based on his client’s musings. By the time of trial, ETE had put the Latham Tax Lawyer as far out on a professional tree limb as it could without causing him to literally plummet to earth. But, this behavior of ETE and its effect on the non-satisfaction of the condition was not viewed through the gimlet-eyed lens that the appropriate standard of review required, one that required ETE to prove that its own breaching conduct did not materially contribute to the Latham Tax Lawyer’s inability to deliver the 721 opinion.
ETE’s suspicious behavior really only got going several months after ETE and Williams signed the deal, after the energy markets in which they both participate materially deteriorated.[59] This market decline meant both ETE and Williams were worth less. For ETE that raised concerns about its capacity to take on additional debt to finance the cash component of the merger,[60] and some at ETE also believed that Williams was more exposed to the downturn than ETE, thus also decreasing the value of what ETE was buying.[61] Crucially, this also meant that, although at the time the Merger Agreement was signed, ETE was paying about $6 billion in cash in exchange for ETC stock worth roughly $6 billion, the ETC stock, which tracked ETE’s market value, had declined to around $2 billion. Yet, because the amount of stock and the dollar amount were both fixed, the exchange became unequal with ETE giving, by some estimates, $4 billion *279 more in cash than it was receiving in the current value of ETC stock.[62]
By January, ETE’s chairman’s preferred solution was terminating the Merger Agreement because of this economic deterioration.[63] Then, in late March, the Latham Tax Lawyer received an unexpected call from Brad Whitehurst. Whitehurst was ETE’s senior executive in charge of tax matters, among other things. The call was unexpected in the sense that in the six months from signing up until Whitehurst had what the Court of Chancery termed his “epiphany,”[64] Whitehurst had never before raised a concern about the structure of the exchange. But, Whitehurst’s epiphany was that he supposedly had believed that the number of ETC shares, i.e., stock tracking ETE’s performance, exchanged for cash would float based on their value, rather than the reality that both the cash consideration and number of shares were fixed.[65] Whitehurst was supposedly concerned that, because the value of the ETC shares had declined materially due to economic conditions, the cash (still $6 billion) and the value of the shares (down from $6 billion to $2 billion) no longer matched. Thus, on Whitehurst’s logic, the IRS might apply the “excess” $4 billion to the leg of the transaction where ETC contributed Williams’ assets to ETE in exchange for ETE units, triggering a taxable gain.[66]
Whitehurst then communicated this concern with the Latham Tax Lawyer on March 29, 2016 triggering a review by Latham of whether it could give the opinion. Absent Whitehurst’s epiphany that required Latham to dig into this new issue, no evidence in the record suggests that Latham would not have simply proceeded to give the opinion it had always intended to give.[67] Indeed, at the time, as the Court of Chancery found, “no one else shared [Whitehurst’s] view.”[68] Whitehurst testified that, despite ample opportunities to do so, including reviewing drafts of deal documents describing the exchange ratio, he hadn’t understood that the amount of stock was fixed.[69] Williams, unsurprisingly, contested the innocence of this epiphany.
Unlike the Majority, I see no part of the Court of Chancery’s decision where it accepted Whitehurst’s story that he only realized that the amount of stock was fixed six months after the agreement was signed. Rather than deciding whether Whi-tehurst was telling the truth, the Court of Chancery just punted, assuming that it was not material to the ultimate issue.[70] *280 Indeed, that punt illustrates the importance of using the correct lens and the inadequacy of the Court of Chancery’s footnote because, to my mind, it matters very much in determining whether ETE met its burden to assess whether White-hurst, a primary operative for ETE on this transaction, was telling the truth when he said that he, the Executive Vice President and Head of Tax of a publicly traded partnership that was a routine dealmaker, was not aware that the value of only one side of a critical part of the merger consideration floated with the valuation of ETE’s business and was thus subject to the vagaries of the market price of oil and gas. If one does not believe that rather improbable claim, it colors everything that Whitehurst says he did or didn’t do and of conduct in the record that he cannot disclaim.[71]
Lawyers by nature tend to be loyal to their clients. This is sort of baked into our professional rules.[72] When Whitehurst told the Latham Tax Lawyer his concerns, it was rather obvious that ETE did not wish to go through with the deal. If somehow a condition excused closing, that would have made ETE ecstatic. When Whitehurst therefore started musing about the potential tax law implications of a provision in the agreement that is kind of hard not to know about, it is difficult to imagine that he was not putting implicit, but undeniably extant, pressure on the Latham Tax Lawyer to have doubts about whether he could give the opinion. Now, of course, ETE argues that this pressure was just of a legitimate legal nature, in the sense of raising, in an innocent way, a potential legal problem to be solved.
*281 To assess if this were so, one would of course wish to consider whether White-hurst was credible in claiming that by gosh, the part-fixed, part-floating nature of the exchange just occurred to him when his employer no longer wished to do the deal, and he had just became curious about its tax implications then. And that all of this was true even though a core part of ■Whitehurst’s title suggests he was supposed to think about the implications of the exchange ratio and the tax eligibility of the deal before ETE signed the agreement. And, it is not as though Whitehurst came off the back of the proverbial vegetable truck. Before ETE, he had a long tax career[73] and no doubt saw the effects of more than one boom and bust cycle in the oil and gas industry. If his testimony that he did not know about the ratio until six months after the deal was signed was not credible, Whitehurst’s legal curiosity would tend to look like an attempt to influence the Latham Tax Lawyer not to give the 721 opinion and it would also tend to suggest his communication with the Latham Tax Lawyer conveyed client pressure to get to no. Given that ETE, and by extension, Whitehurst, had exactly the opposite duty—to act in a commercially reasonable fashion to obtain the 721 opinion[74]—this would be extremely problematic.
Compounding this curious beginning is how "Whitehurst and the Latham Tax Lawyer, and therefore ETE, approached its compliance with the covenant to act in a commercially reasonable fashion. The Majority seems to suggest that ETE encouraged the Latham Tax Lawyer to come to the table with its transactional counsel, Wachtell, and try to brainstorm about the tax issue and solve it.[75] That is in fact the opposite of what the record suggests happened. When Wachtell was approached by the Latham Tax Lawyer about the tax issue—nine days after the issue was originally raised, a lifetime by deal standards— Wachtell’s reaction was that there was no issue.[76] Thus, Wachtell was well positioned to help ETE satisfy its contractual duties by working with Latham to get to the point where the required opinion could be given. Instead of encouraging this type of cooperation and making absolutely clear to Latham that ETE wanted it to get to yes and to be supple and open-minded about noodling with others about the issue, ETE did the opposite and at no point was Wach-tell asked to assist with the analysis. Rather, the record suggests ETE took steps to keep Wachtell away from collaboration with Latham to get to yes.[77] Likewise, when ETE hired other tax lawyers, at Morgan Lewis, to consult on the issue, it did not ask them to get in a room with Latham and Wachtell and figure out a way to get to yes.[78] In fact, ETE told Morgan Lewis that they were not to talk to La-tham.[79]
*282 Even more important, Whitehurst and Latham kept the other side of the transaction in the dark for a commercially unreasonable and thus highly suspect period of time. It was a full two weeks after White-hurst contacted the Latham Tax Lawyer, before Latham informed Williams’ counsel, Cravath, that they were not in a position to deliver the 721 opinion. This was the first time that Cravath, or, it appears, any of Williams’ advisors or staff, had heard of the problem and it was only once the Latham Tax Lawyer had come to a firm conclusion. Then, a mere six days later, ETE filed an amended proxy statement that publicly disclosed Latham’s position that it would not deliver the 721 opinion, in Whitehurst’s words “poison[ing] the well.”[80] There was no reason to amend the disclosure so urgently nor is it obviously the case that Latham’s view necessarily had to be included at the time.[81]
Under the circumstances, disclosing La-tham’s position easily could be read as another tactic by ETE to pin the Latham Tax Lawyer down. In human terms, by issuing a public statement that Latham could not deliver the 721 opinion, ETE put the Latham Tax Lawyer in a position of having to publicly move off its previous position after the world had been told what that was. It does not take much experience with human nature to realize how much more difficult it is to get someone—say a judge—to reverse herself after making a ruling than it is to get that person to remain open to multiple possibilities in advance of a ruling. Anyone who consults statistics about the success rate of reargument motions would be convinced of this obvious human reality. That reality must be taken into account with the stark numbers: ETE concealed the issue from Williams for fourteen days, but took barely six days to try to work the issue out with them.
Somewhat trampled in ETE’s rush to file the good news were Cravath’s proposals for addressing Latham’s concerns, which they delivered to Latham only two days after hearing of the concerns for the first time. Latham didn’t get back to Cra-vath on those proposals until well after the proxy was filed, fifteen days after Cravath proposed them. Of course, we know La-tham’s answer was that neither proposal was workable, although there was testimony that some at Latham believed at least one proposal would help and that there was concern it “helps, enough.”[82] Morgan Lewis also seemed to think that one of Cravath’s proposals might work.[83] But, by this time, Latham was in the public Klieg lights, its client ETE clearly did not wish to get to yes, and Whitehurst was not arguing that everyone get in a room and solve the problem. Rather, the Court of Chancery’s fact finding suggests the conversation was rather one way: “Latham conveyed its conclusion on the proposed modifications to both Williams and Cra-vath.” [84] So, these suggestions, which in a *283 more collaborative environment shaped by-good faith on the part of ETE might have provided a complete solution, instead were given little consideration.
The failure to get to yes is all the more questionable because of the number of people who seemed to think Whitehurst’s theory was, at best, strained. Initially, no one on either side shared Whitehurst’s view or that of the Latham Tax Lawyer who adopted it,[85] Lawyers from both Cra-vath and Wachtell thought there was either no issue or potential solutions to the issue Whitehurst identified. Williams’ expert, Professor Howard Abrams, testified no reasonable tax attorney would refuse to issue the 721 opinion,[86] and, indeed, ETE’s own experts, Abraham Shashy and Professor Ethan Yale,[87] didn’t buy into the La-tham Tax Lawyer’s theory—they had their own reasons for warning the transaction risked not receiving tax-free treatment,[88] and those experts conceded that changing certain questionable factual assumptions provided to them by ETE might reverse their conclusion entirely.[89]
Like the Court of Chancery, this recitation of the record leaves me sympathetic with the Latham Tax Lawyer when he said he could not get to‘yes. But, unlike the Court of Chancery, this record suggests to me the need for a view of the evidence through the right lens, not to exculpate the very conduct that put La-tham in such an awkward position. In other words, the Court of Chancery’s sympathy toward the Latham Tax Lawyer had the effect of ignoring the covenant-breaching behavior that put the Latham Tax Lawyer under undue professional pressure in the first place. The multiple forms of behavior that breached ETE’s affirmative obligation are exactly the kind of conduct that compromised the ability of the La-tham Tax Lawyer to find a way to yes, and that foreclosed any meaningful consideration of economically immaterial adjustments to the transaction that might have solved any genuine tax concern.
*284 As to this, there is, of course, a final irony. Adjusting the manner in which the agreed-upon consideration would pass, by a modest amendment of the merger agreement, would have had no material economic effect on ETE from the terms of the deal it clearly struck. That this would have simply required ETE to amend a provision that the tax lawyer, Whitehurst, who was central to its contractually improper behavior claimed he did not know about and that was the “inspiration” for his tax concerns has a metallic taste to it, because if Whitehurst did not consider those provisions important enough to understand, the modest amendment required to fix the problem certainly would not have undermined any contractual expectation central to ETE’s decision to bind itself to buy Williams.
The Court of Chancery was of course right that “even a desperate man can be an honest winner of the lottery.”[90] But under settled contract law, when, in desperation, you breach your obligation to help a condition come about, you do not get credit for rigging the game. For these reasons, I would remand and require a new trial at which ETE would be required to prove that its breach did not materially contribute to the failure of the Latham Tax Lawyer to deliver the 721 opinion.

. Majority Op. at 273.

. Id.

. App. to Appellant’s Opening Br, at 680 (Merger Agreement, § S,07(b)). The Majority also rightly notes that ETE was obligated to use "reasonable best efforts” to consummate the transaction as a whole. Id. at 671 (Merger Agreement, § 5.03(a)).

. See Lou R. Rung & Eileen T. Nugent, Negotiated Acquisitions of Companies, Subsidiaries and Divisions § 13.06 (2001) (observing that "best efforts” standards can potentially lead to the party making the promise having to take extreme measures to fulfill it and that “commercially reasonable efforts” is a strong, but slightly more limited, alternative).

. E.g., Williams Companies, Inc., 2016 WL 3576682, at *18 ("Unlike the record in this case, in Hexion the buyer actively and affirmatively torpedoed its ability to finance. If the record here reflected affirmative acts by [ETE] to coerce or mislead Latham, by which actions it prevent issuance of the 721 Opinion ... the outcome here would likely be different.”).

. Id. at* 18.

. Id. at *15.

. Id. at *7.

. James C. Freund, Anatomy of a Merger: Strategies & Techniques for Negotiating Corporate Acquisitions 56 (1975) C'[T]he subject of purchase price [is] obviously the singly most important aspect of any acquisition transaction.”); id. at 175 ("In spite of all the legalistic paraphernalia of modern acquisitions ... the purchase price remains the most venerable indicium of a gratifying deal.”); Kling & Nugent, supra note 45, at § 1.01 (describing price and form of consideration as two of the "threshold questions” of an acquisition); id. at § 1.05[1] (describing the terms of a merger agreement specifying price and form of consideration as potentially "the most important in the entire agreement”).

. Appellees’ App. to Answering Br. at B0020-22 (Form 8-K/A, the Williams Companies, Inc. with corrected Merger Agreement, Oct. 1, 2015).

. Majority Op. at 274-75.

. Williams Companies, Inc., 2016 WL 3576682, at *6.

. App. to Appellant’s Opening Br. at A636-37 (Agreement and Plan of Merger, dated Sept. 28, 2015 § 3.01(n)(i)).

. Majority Op, at 273-74.

. WaveDivision Holdings, LLC v. Millennium Digital Media Systems, L.L.C., 2010 WL 3706624, at *15 (Del. Ch. Sept. 17, 2010) (breaching party required to demonstrate that breach did not materially contribute to failure of condition); Hexion Specialty Chemicals, Inc. v. Huntsman Corp., 965 A.2d 715, 755 (Del. Ch. 2008) (placing burden on breaching party to show "that there were no viable options it could exercise to allow it to perform without disastrous financial consequences”); see also Bloor v. Falstaff Brewing Corp., 601 F.2d 609, 614 (2d Cir. 1979) (shifting burden to breaching party to "prove there was nothing significant it could have done to [fulfill its contractual commitment] that would not have been financially disastrous”); Restatement (Second) of Contracts 245 cmt. b ("[I]f it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and the rule does not apply. The burden of showing this is properly thrown on the party in breach." (emphasis added)).

. Williams Companies, Inc., 2016 WL 3576682, at *16 n. 130.

. Id.

. Id. at *4.

. Id.

. App. to Appellant’s Opening Br. at A2599-600 (Plaintiff’s Corrected Opening Pretrial Br., dated June 16, 2016).

. Williams Companies, Inc., 2016 WL 3576682, at *6.

. Id. at *4.

. Id. at *12. Epiphany is an odd word for this spiritual revelation. Put aside the more general concern about combining the sacred and the profane, Whitehurst’s epiphany did not inspire him to selflessly give away his wealth and stock to devoting his life to helping the poor and lost come to righteousness. His epiphany involved conjuring up a reason his employer could avoid buying a company it once dearly desired and instead forsaking that partner. Less an epiphany, then, and more like if Fezziwig had been visited by Marley and urged to change his ways and become like pre-reform Scrooge!

. Williams Companies, Inc., 2016 WL 3576682, at *6.

. Id.

. Id. at *7 (“Before its conversation with Whitehurst, Latham was preparing to issue the 721 Opinion and had never considered that it would be unable to issue it.” (emphasis added)).

. Id. at *6.

. Id. at *7.

. The Vice Chancellor noted "I do not need to resolve the issue of Whitehurst’s motivation” when dealing with Latham's analysis, *280 id. at *12, and that the question of if White-hurst’s call to Latham was "a veiled suggestion” that Latham assist ETE in avoiding the transaction was "an issue on which I need not opine,” id. at *17. Indeed, the Vice Chancellor seemed to even express some skepticism when he referred to "Whitehurst’s epiphany, if such it was.” Id. at *12.

. I respectfully disagree with my friends in the Majority on one key, related point. The Majority says that Williams does not challenge that Latham’s “determination that it could not issue the 721 opinion was a good faith determination made by it independent of any conduct by ETE." Id. at 4 (emphasis added), Although I agree that Williams does not challenge on appeal the Court of Chancery’s finding that Latham acted in good faith in declining to give the 721 opinion, I do not agree that Williams did not challenge the Court of Chancery's terse conclusion that La-tham’s failure to issue the opinion was not influenced by the conduct of ETE and, in particular, Whitehurst. In fact, the central focus of Williams' appellate argument is that the Court of Chancery failed to apply the appropriate prism on that question, and that it erred because it should have required ETE to show that the 721 opinion condition would not have been satisfied had it acted appropriately. See, e.g., Appellant’s Opening Br. at 23 ("Following Delaware law, the Court of Chan-eery should have .,. [required] ETE to prove that [its] acts and omissions did not materially contribute to the failure of the closing condition,”); id. at 28 ("ETE’s secrecy, its refusal to permit Latham to engage with Cravath, its decision to box Latham in by quickly publishing Latham’s views, its refusal to explore potential solutions to Latham’s concerns, its failure to explore Williams' proposed fixes or to ask its tax advisors to try to come up with their own and, generally, its decision to place its own economic interest in terminating the Transaction ahead of its contractual commitments all plainly breached ETE’s efforts obligations.”); id. at 36 ("We simply do not know how Latham ultimately would have resolved the issues if, contrary to fact, ETE had engaged meaningfully with Williams and otherwise complied with its efforts obligations.”).

, E.g., Del. Lawyers' Rules of Prof. Conduct R. 1.3 cmt. 1 ("A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client’s cause or endeavor. A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client’s behalf.”).

. App. to Appellant’s Opening Br. at A2817 (Trial Tr., Vol. 1, dated June 20, 2016, Bradford Whitehurst).

. See Majority Op. at 273 ("These provisions placed an affirmative obligation on the parties to take all reasonable steps to obtain the 721 opinion and otherwise complete the transaction.”).

. Id. at 8.

. App. to Appellant’s Opening Br. at A907 (Handwritten notes of April 7, 2016 conference call (JX132)).

. Id. at A2865 (Trial Tr., Vol. 1, dated June 20, 2016, Alison Preiss Video Clips).

. A Cravath partner testified that a Wachtell partner told him that Wachtell "was not permitted by” ETE to speak with Morgan Lewis. Id. at A2800 (Trial Tr., Vol. 1, dated June 20, 2016, Minh Van Ngo).

. Id. at A2930 (Trial Tr., Vol. 2, dated June 21, 2016, William McKee).

. Id. at A2433 (Deposition of Brad White-hurst taken on June 13, 2016).

. In fact, Cravath objected to including the disclosure—unsurprising because they had not heard back from Latham on their proposed fixes, much less on their position that the issue was, in fact, a nonissue. Id.

. Id. at A928 (Email chain re: McKee & Structure Changes, dated Apr. 15, 2016 0X151)).

. Id. at A1028 (Email chain re: Notes from Latham call, with attachment, dated May 23, 2016 0X534)).

. Williams Companies, Inc., 2016 WL 3576682, at *8.

. Id. at *6.

. Id. at *14. Professor Abrams is the Warren Distinguished Professor and director of the tax program at University of San Diego Law School. App. to Appellant's Opening Br. at A2891 (Trial Tr„ Vol. 2, dated June 21, 2016, Howard Abrams).

. Abraham N.M. Shashy, Jr. is the Tax Practice Group Leader at the law firm King & Spalding LLP, id. at A1840-41 (Expert Affidavit of Abraham N.M. Shashy, Jr., dated June 3, 2016 (JX572)), and Professor Ethan Yale is a Professor of Law at the University of Virginia School of Law, id. at A1890 (Expert Affidavit of Professor Ethan Yale, dated June 3, 2016 (JX573)).

. Id. at A1870 (Expert Affidavit of Abraham N.M. Shashy, Jr., dated June 3, 2016 (JX572)) (stating that "the risk is substantial” that the transaction would not receive tax-free treatment); id. at A1911 (Expert Affidavit of Professor Ethan Yale, dated June 3, 2016 (JX573)) (stating "there is serious doubt” that the transaction would receive tax-free treatment).

.Id. at A2244 (Deposition of Abraham N.M. Shashy, Jr. taken on June 11, 2016); id. at A2926 (Trial Tr„ Vol. 2, dated June 21, 2016, Ethan Yale). The crux of the issue was that ETE told the tax experts that there was no non-tax motive for the transfer of ETC shares to ETE, e.g., id. at A2230 (Deposition of Abraham N.M. Shashy, Jr. taken on June 11, 2016), but, Williams argues that the Court of Chancery's finding that another reason for the transfer was that "it aligned interests between [ETE] and ETC” so that "[a]ctions taken by [ETE after the consummation of the merger], therefore, would likely be consistent with the interests of ETC and its stockholders as well,” Williams Companies, Inc., 2016 WL 3576682, at *13, suggests ETE’s provided assumption was inaccurate, and, thus, ETE’s experts would likely have come to a different view with a more accurate picture of the transaction.

. Williams Companies, Inc., 2016 WL 3576682, at *2.